| Officer | Written & Seniority Score | Rank After Written & Seniority | Oral Score (× 35%) | Cumulative (All Weighted Scores) | Rank After Cumulative Score |
|---|---|---|---|---|---|
| Adams, B. | 57.71 | 6 | 17.97 | 75.68 | 17 |
| Anderson, R. | 56.74 | 10 | 27.17 | 83.91 | 7 |
| Aulwes, J. | 58.04 | 5 | 26.17 | 84.21 | 4 |
| Baer, K. | 54.46 | 14.5 | 23.88 | 78.34 | 11 |
| Best, J. | 54.46 | 14.5 | 30.48 | 84.94 | 3 |
| **Bryant, J. (black)** | **55.42** | **13** | **22.73** | **78.15** | **12** |
| Chapman, G. | 55.47 | 12 | 18.50 | 73.97 | 20 |
| **Gilbert, J. (black)** | **60.18** | **1** | **20.39** | **80.57** | **10** |
| Haggard, R. | 56.44 | 11 | 24.74 | 81.18 | 9 |
| Haltom, K. | 53.78 | 19 | 30.31 | 84.09 | 5 |
| Holladay, C. | 57.37 | 8 | 32.81 | 90.18 | 1 |
| Keel, J. | 57.13 | 9 | 19.84 | 76.97 | 14 |
| Martin, J. | 54.19 | 18 | 22.32 | 76.51 | 15 |
| Nelson, C. | 53.23 | 20 | 20.80 | 74.03 | 19 |
| **O'Donald, B. (black)** | **58.67** | **2** | **30.44** | **89.11** | **2** |
| Porterfield, M. | 52.71 | 21 | 18.02 | 70.73 | 21 |
| Seats, J. | 58.36 | 3 | 17.30 | 75.66 | 18 |
| Thomas, C. | 54.33 | 16 | 22.73 | 77.06 | 13 |
| Vickers, M. | 57.69 | 7 | 24.43 | 82.12 | 8 |
| **Walters, H. (black)** | **58.18** | **4** | **25.84** | **84.02** | **6** |
| Williams, S. | 54.21 | 17 | 21.53 | 75.74 | 16 |

**WEST PUBLISHING COMPANY, Appellee,**

v.

**MEAD DATA CENTRAL, INC., Appellant.**

No. 85–5399.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1986.

Sept. 4, 1986.

William E. Willis, New York City, for appellant.

Vance K. Opperman, Minneapolis, Minn., for appellee.

Before ARNOLD and FAGG, Circuit Judges, and OLIVER,* Senior District Judge.

ARNOLD, Circuit Judge.

Mead Data Central, Inc. (MDC) appeals from a preliminary injunction issued by the District Court for the District of Minnesota [1] in a copyright-infringement action brought by West Publishing Company (West). West's claim is based upon MDC's proposed introduction of "star pagination," keyed to West's case reports, into the LEX-IS system of computer-assisted legal research.

For more than a century, West has been compiling and reporting opinions of state and federal courts. West publishes these opinions in a series of books known as the "National Reporter System." Before it publishes an opinion, West checks the accuracy of case and statutory citations in the opinion and adds parallel citations, pre-

* The Hon. John W. Oliver, Senior United States District Judge for the Western District of Missouri, sitting by designation.

1. The Hon. James M. Rosenbaum, United States District Judge for the District of Minnesota.

pares headnotes and a synopsis for the opinion, and arranges the opinion in West's style and format. West then assigns its report of each opinion to one of the individual series in the National Reporter System, such as *Federal Reporter, Second Series* or *Bankruptcy Reporter;* this assignment is based on the court and/or the subject matter of the opinion. Next, West assigns the case to a volume in the series, further categorizes and arranges the cases within the volume, and prepares additional materials, such as indices and tables of cases, for each volume. Volumes and pages are numbered sequentially to facilitate precise reference to West reports; citing the proper volume number, series name, and page number communicates the exact location of a West report, or a portion thereof, within the National Reporter System. West represents that upon completion of each volume, it registers a copyright claim with the Register of Copyrights and receives a Certificate of Registration for the volume.

MDC developed, owns, and operates LEXIS, a computer-assisted, on-line legal-research service first marketed in 1973. LEXIS, like West's National Reporter System, reports the decisions of state and federal courts. Since LEXIS's inception, MDC has included on the first computer screen of each LEXIS case report the citation to the first page of West's report of the opinion. West concedes that citation to the first page of its reports is a noninfringing "fair use" under 17 U.S.C. § 107, so these citations are not at issue here.

On June 24, 1985, MDC announced that it planned to add "star pagination" to the text of opinions stored in the LEXIS database. This new service, named the LEXIS Star Pagination Feature, was to be available to LEXIS users by September or October of 1985. This feature would insert page numbers from West's National Reporter System publications into the body of LEXIS reports, providing "jump" or "pinpoint" citations to the location in West's reporter of the material viewed on LEXIS. Thus, with the LEXIS Star Pagination Feature, LEXIS users would be able to determine the West page number corresponding to the portion of an opinion viewed on LEXIS without ever physically referring to the West publication in which the opinion appears.

In response to MDC's announcement, West brought this action, claiming, *inter alia,* that the LEXIS Star Pagination Feature is an appropriation of West's comprehensive arrangement of case reports in violation of the Copyright Act of 1976, 17 U.S.C. §§ 101–810. West sought, and was granted, a preliminary injunction. *West Publishing Co. v. Mead Data Central, Inc.,* 616 F.Supp. 1571 (D.Minn.1985). The District Court held that there is a substantial likelihood that West's arrangements of case reports are protected by copyright law, that MDC's copying of West's pagination constitutes copyright infringement, and that MDC's star pagination is not a fair use of West's copyrighted works. 616 F.Supp. at 1575–1581. The Court further held that the balance of the harms to West and to MDC involved in granting or denying a preliminary injunction weighed in favor of granting an injunction, and that the public interest also favored preliminary injunctive relief. 616 F.Supp. 1581–1583. We affirm.

## ANALYSIS

 Whether a preliminary injunction should issue turns upon four factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant should a preliminary injunction be denied; (3) the balance between this harm and the harm that granting the injunction will cause to the other parties litigant; and (4) the public interest. *Dataphase Systems, Inc. v. C L Systems, Inc.* 640 F.2d 109, 113 (8th Cir. 1981) (en banc). None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction. *Id.* On appeal, we may not disturb the District Court's balancing of the equities absent a clearly erroneous factual determi-

nation, an error of law, or an abuse of discretion. *O'Connor v. Peru State College,* 728 F.2d 1001, 1002 (8th Cir.1984); *Edudata Corp. v. Scientific Computers, Inc.,* 746 F.2d 429, 430 (8th Cir.1984) (per curiam).

I.

MDC's principal contention here is that there is no likelihood that West will succeed on the merits of its copyright claim. MDC readily concedes that portions of West's National Reporter System publications that are not at issue here, such as headnotes prepared by West, merit copyright protection.[2] Yet, MDC maintains that any aspects of West's reporters affected by the LEXIS Star Pagination Feature are not copyrightable. The dominant chord of MDC's argument is that West claims copyright in mere page numbers. MDC adds that in any event, whether West claims copyright in its case arrangement or simply in its pagination, West's claim must fail because neither case arrangement nor pagination can ever qualify as the original work of an author. Even were this possible, MDC goes on, West's case arrangement and pagination do not in fact meet this standard. Finally, MDC contends that even were West's arrangement of cases protected by copyright, the proposed use of West's page numbers in LEXIS reports would not constitute infringement.

We do not agree with MDC that West's claim here is simply one for copyright in its page numbers. Instead, we concur in the District Court's conclusion that West's arrangement is a copyrightable aspect of its compilation of cases, that the pagination of West's volumes reflects and expresses West's arrangement, and that MDC's intended use of West's page numbers infringes West's copyright in the arrangement.

A. Copyright Protection

■ The Copyright Act provides copyright protection for "original works of au-

thorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). The standard for "originality" is minimal. It is not necessary that the work be novel or unique, but only that the work have its origin with the author—that it be independently created. *Hutchinson Telephone Co. v. Fronteer Directory Co.,* 770 F.2d 128, 131 (8th Cir.1985). Little more is involved in this requirement than "a prohibition of actual copying." *Alfred Bell & Co. v. Catalda Fine Arts,* 191 F.2d 99, 102–103 (2d Cir.1951); see also M. Nimmer, 1 *Nimmer on Copyright* § 2.01 (1985).

■ To be the original work of an author, a work must be the product of some "creative intellectual or aesthetic labor." *Goldstein v. California,* 412 U.S. 546, 561, 93 S.Ct. 2303, 2312, 37 L.Ed.2d 163 (1973). However, "a very slight degree of such labor[,] ... almost any ingenuity in selection, combination or expression, no matter how crude, humble or obvious, will be sufficient" to make the work copyrightable. M. Nimmer, 1 *Nimmer on Copyright, supra,* § 1.08[C][1]; *id.,* § 1.06. See *Rockford Map Publishers v. Directory Service Company* 768 F.2d 145, 148–149 (7th Cir.1985) (map based on Agriculture Department photographs and legal descriptions is copyrightable, no matter how quickly or with what little effort it is produced), *cert. denied,* —— U.S. ——, 106 S.Ct. 806, 88 L.Ed.2d 781 (1986); *Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 908 (3d Cir.) ("even a modicum of creativity may suffice for a work to be protected"), *cert. denied,* 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975).

■ MDC argues that case arrangement is *per se* uncopyrightable because it cannot meet these standards. However, it is apparent on the face of the Copyright Act that it is possible for an arrangement of pre-existing materials to be an independently produced work of intellectual creation. Section 103 of the Act, 17 U.S.C.

**2.** West does not and could not claim any copyright in the judicial opinions themselves. See *Wheaton v. Peters,* 8 Pet. 591, 668, 33 U.S. 591, 8 L.Ed. 1055 (1834) ("no reporter ... can have any copyright in the written opinions delivered by this court").

§ 103, establishes that "the subject matter of copyright ... includes compilations and derivative works." A "compilation" is defined in the Act as:

a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

17 U.S.C. § 101. An arrangement of opinions in a case reporter, no less than a compilation and arrangement of Shakespeare's sonnets, can qualify for copyright protection.

We find support for this view in *Callaghan v. Myers*, 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547 (1888), which indicates that an original arrangement of opinions is copyrightable whenever it is the product of labor, talent, or judgment. The plaintiff in that case, Myers, held copyrights for several volumes of reports of the Supreme Court of Illinois. He had purchased these rights from the official reporter of that Court, who had prepared the volumes. In addition to the Court's opinions, the volumes contained a substantial amount of material original to the reporter, including headnotes, statements of facts, tables of cases, indices, and so on. Myers brought an infringement action against the publishers of a competing reporter of Illinois Supreme Court opinions who had copied from Myers's reports material created by the official reporter, as well as the arrangement and pagination of some volumes. The trial court found Myers's copyrights valid and infringed. The Supreme Court affirmed, holding that the fact that Myers sought to protect material prepared by the official court reporter did not bar his claim, since no Illinois legislation forbade the reporter to obtain a copyright for matter that was the product of his intellectual labor. 128 U.S. at 646–647, 95 S.Ct. at 184.

As MDC points out, the treatment of case arrangement and pagination in *Callaghan* was not crucial to the Court's decision, since the defendants had also made use of other portions of Myers's volumes, such as headnotes and statements of facts. Nonetheless, we find *Callaghan*'s discussion of the copyrightability of case arrangements instructive. The Supreme Court noted that while the reporter could claim no copyright in the opinions themselves, 128 U.S. at 649, 9 S.Ct. at 185, *citing Wheaton v. Peters*, 8 Pet. 591, 668, 33 U.S. 591, 668, 8 L.Ed. 1055 (1834), he could copyright other portions of his reports. Mr. Justice Blatchford wrote that, in addition to headnotes, statements of facts, arguments of counsel, case tables, and indices,

[s]uch work of the reporter, which may be the lawful subject of copyright, comprehends ... the order of arrangement of the cases, the division of the reports into volumes, the numbering *and paging* of the volumes, the table of the cases cited in the opinions, (where such table is made,) and the subdivision of the index into appropriate, condensed titles, involving the distribution of the subjects of the various head-notes, and cross-references, where such exist.

*Callaghan*, 128 U.S. at 649, 9 S.Ct. at 185 (emphasis ours).

■ Later in its opinion, however, when considering several volumes that Myers claimed the defendants had infringed by copying their case arrangement and pagination, the Court quoted with approval the opinion of the Circuit Court, which stated:

Undoubtedly, in some cases, where are involved labor, talent, judgment, the classification and disposition of subjects in a book entitle it to a copyright. But the arrangement of law cases and the paging of the book may depend simply on the will of the printer, of the reporter, or publisher, or the order in which the cases have been decided, or upon other accidental circumstances.

128 U.S. at 662, 9 S.Ct. at 190, *quoting Myers v. Callaghan*, 20 Fed. 441, 442 (C.C. N.D.Ill.1883). Evaluating the volumes at issue, the Circuit Court concluded that their case arrangement and pagination involved little labor; it therefore found the defendants' copying of the case arrange-

ment and pagination of Myers's volumes not an independent infringement, but a matter to be considered in connection with other similarities in the parties' reporters. *Id.* The teaching of *Callaghan* with respect to the issues before us does not come through with unmistakable clarity. But as we read it, *Callaghan* establishes at least that there is no *per se* rule excluding case arrangement from copyright protection, and that instead, in each case the arrangement must be evaluated in light of the originality and intellectual-creation standards.

For the proposition that case arrangement and pagination cannot, as a matter of law, meet originality and intellectual-creation requirements, MDC relies heavily upon *Banks Law Publishing Co. v. Lawyer's Co-Operative Publishing Co.*, 169 Fed. 386 (2d Cir.1909) (per curiam), *appeal dismissed by stipulation*, 223 U.S. 738, 32 S.Ct. 530, 56 L.Ed. 636 (1911). The plaintiff in *Banks* was the successor to the copyrights of an official reporter of the United States Supreme Court in published volumes of opinions compiled by the reporter. The defendant published a competing edition of the Supreme Court's decisions. The plaintiff claimed copyright infringement based on the defendant's reproduction of the plaintiff's arrangement of cases and on the defendant's star pagination to the plaintiff's reports. The trial court rejected the plaintiff's claim that its case arrangement and pagination merited copyright protection; the Second Circuit, in a per curiam opinion, reproduced the trial court's opinion in full, adopting the opinion as its own.

In our view, *Banks* does not support MDC's claim that case arrangement is uncopyrightable *per se;* we agree with the District Court that instead, the denial of copyright protection in *Banks* was based upon the official status of the reporter. See 616 F.Supp. at 1577. The plaintiff in *Banks* argued that its case arrangements were the product of sufficient intellectual labor to be copyrightable because the reporter's general, though not unalterable, approach in arranging cases was to begin each volume with what he considered to be the most important cases on hand and to group cases on the same subject matter together. The *Banks* court responded by noting that the official reporter was required by statute to prepare reports of Supreme Court decisions, gather them into volumes, and have them printed and published. To fulfill this duty, the court continued, the reporter must of necessity provide an orderly arrangement of cases and pagination for the volumes. The court concluded that "no valid copyright for these elements or details alone can be secured to the official reporter." 169 Fed. at 390. Although it acknowledged that "[t]he trend of some of the decisions and of the textwriters indicates that an arrangement of the material matter of a book may be the subject of a valid copyright," the court rejoined that,

> [A]ny principle upon which such cases are based is not thought applicable where the arrangement of the cases, though involving some merit, so obviously was necessary to produce the volumes required by the statute. Such labor, under the circumstances presented, like the decisions and opinions of the court, became the property of the public.

*Id.* We conclude that the ultimate rationale for the *Banks* decision was that while under *Callaghan* the official reporter could copyright any material that was the product of his intellectual labor, because the reporter's statutory duties required case arrangement and pagination, these should not be considered the product of the reporter's intellectual labor.

MDC contends that *Banks* did not turn on the reporter's official status. It points out that the statute prescribing the reporter's duties in *Banks* did not specify how cases were to be arranged or how volumes of reports were to be paginated, so that the reporter exercised judgment and discretion in these matters. MDC concludes that *Banks* must therefore be read to hold broadly that arrangement and pagination are publishing details involving too little intellectual labor to be copyrightable. We

agree with MDC that the reporter in *Banks* exercised independent judgment. However, the *Banks* court dismissed the matters in which the reporter exercised discretion as things done "voluntarily and in evident compliance with the proper and faithful discharge of his official duties." 169 Fed. at 389–390. While we would be inclined to examine the official reporter's independent efforts in arrangement and pagination on their merits to see if they meet originality and intellectual-creation requirements, the *Banks* court did not do so because it was unwilling to look past the fact that they were done to meet the reporter's statutory obligations.

Several other reasons persuade us not to give *Banks* the full force for which MDC contends. If it involved the copyright claims of an official reporter, so too did *Callaghan,* and yet *Callaghan* does not seem so hostile to the very idea that case compilation, arrangement, and paging can be protected by copyright. To the extent that *Banks* diverges from *Callaghan,* we of course follow the Supreme Court. *Banks,* moreover, requires a greater degree of intellectual creativity than the trend of modern cases, see, *e.g., Rockford Map, supra.* And it was written at a time when the statute did not in express words declare that "compilations and derivative works," defined to include "the collection and assembling of preexisting materials," can be copyrighted. See Act of March 3, 1905, ch. 1432, Pub. L. No. 58–165, 33 Stat. 1000 (1905) (repealed 1909).

MDC argues, citing, *e.g.,* Order of June 7, 1978, Minnesota Supreme Court (unreported), that West is the "official reporter" for some states, and that, therefore, even a narrow reading of *Banks* supports its position. We are inclined to think that the term "official reporter" in orders discontinuing, for example, the *Minnesota Reports,* and providing that the *Northwestern Reporter* should henceforth be the "official reporter" for the opinions of the Supreme Court of Minnesota, means something quite different from the title "official reporter" held by Messrs. Wheaton and Peters. We do not believe that West is employed by any State, with a salary and duties fixed by statute, and with the details of its work controlled by statute or rule. But even if it is, the facts of this case, as found on the present record by the District Court, convince us that West has used sufficient talent and industry in compiling and arranging cases to entitle it to copyright protection under the 1976 Act as construed by the more recent cases.

Having determined that there is no *per se* rule that case arrangements are not copyrightable, we turn to examine the District Court's findings that West's arrangements in fact meet originality and intellectual-creation requirements.

West publishes opinions not from just one court, but from every state and all the federal courts in the United States. As it collects these opinions, West separates the decisions of state courts from federal-court decisions. West further divides the federal opinions and the state opinions and then assigns them to the appropriate West reporter series. State court decisions are divided by geographic region and assigned to West's corresponding regional reporter. Federal decisions are first divided by the level of the court they come from into district court decisions, court of appeals decisions, and Supreme Court decisions; Court of Claims and military court decisions are also separated out. Before being assigned to a reporter, district court decisions are subdivided according to subject matter into bankruptcy decisions, federal rules decisions, and decisions on other topics. After an opinion is assigned to a reporter, it is assigned to a volume of the reporter and then arranged within the volume. Federal court of appeals decisions, for example, are arranged according to circuit within each volume of West's *Federal Reporter, Second Series,* though there may be more than one group of each circuit's opinions in each volume.

■ We conclude, as did the District Court, that the arrangement West produces through this process is the result of considerable labor, talent, and judgment.

As discussed above, *supra* pp. 1223–1224, to meet intellectual-creation requirements a work need only be the product of a modicum of intellectual labor; West's case arrangements easily meet this standard. Further, since there is no allegation that West copies its case arrangements from some other source, the requirement of originality poses no obstacle to copyrighting the arrangements. In the end, MDC's position must stand or fall on its insistence that all West seeks to protect is numbers on pages. If this is a correct characterization, MDC wins: two always comes after one, and no one can copyright the mere sequence of Arabic numbers. As MDC points out, the specific goal of this suit is to protect some of West's page numbers, those occurring within the body of individual court opinions. But protection for the numbers is not sought for their own sake. It is sought, rather, because access to these particular numbers—the "jump cites"—would give users of LEXIS a large part of what West has spent so much labor and industry in compiling, and would *pro tanto* reduce anyone's need to buy West's books. The key to this case, then, is not whether numbers are copyrightable, but whether the copyright on the books as a whole is infringed by the unauthorized appropriation of these particular numbers. On the record before us (and subject to reconsideration if materially new evidence comes in at the plenary trial on the merits), the District Court's findings of fact relevant to this issue are supportable. We therefore hold (again subject to reexamination after the record has closed) that West's case arrangements, an important part of which is internal page citations, are original works of authorship entitled to copyright protection.

### B. Infringement

 We further hold (with a similar qualification) that MDC's proposed use of West page numbers will infringe West's copyright in the arrangement. The LEXIS Star Pagination Feature, when used in conjunction with another LEXIS feature called "LEXSEE," will permit LEXIS users to view the arrangement of cases in every volume of West's National Reporter System. LEXSEE enables the LEXIS user to have his or her terminal display a case by "inputting" the citation to the first page of West's report of the case. With the LEXIS Star Pagination Feature, a LEXIS user could summon up the first case in a West Volume, page through it until he or she reaches the end of the case, and discern from the "jump cite" for the final page of the case the citation for the first page of the next case in the volume. The LEXIS user could then use LEXSEE to call up the next case. By repeating this procedure, the LEXIS user would be able to page through each succeeding case in the West reporter. MDC conceded at oral argument that this operation would be possible, but argued that LEXIS users would be unlikely to perform it because of the cost involved in doing repeated LEXSEE searches. However, MDC has cited no authority, nor do we see any persuasive argument, for the proposition that because consumers may find an infringing work uneconomical, the work is not an infringement. An author's rights in a copyrighted work protect the author not only against infringing works less expensive than the original, but against more expensive infringements as well. Further, though this use of LEXIS may presently be uneconomical, changes in technology and other market conditions could well alter the situation.

Even if the LEXIS Star Pagination Feature did not make it possible to use LEXIS to page through cases as they are arranged in West volumes, we would still hold that MDC's use of West's page numbers infringes West's copyright in the arrangement. Jump cites to West volumes within a case on LEXIS are infringing because they enable LEXIS users to discern the precise location in West's arrangement of the portion of the opinion being viewed. MDC contends that these page numbers communicate nothing about West's arrangement. This might be true if MDC proposed to use the numbers in some way unconnected to their position in West's re-

porters, for example by simply printing a list of the numbers. However, MDC understandably has no interest in making such a use of the numbers; instead, it plans to replicate on LEXIS every page break in West's volumes and to note the corresponding West page number. Communication to LEXIS users of the location in West's arrangement of specific portions of text is precisely what the LEXIS Star Pagination Feature is designed to do.

With MDC's star pagination, consumers would no longer need to purchase West's reporters to get every aspect of West's arrangement. Since knowledge of the location of opinions and parts of opinions within West's arrangement is a large part of the reason one would purchase West's volumes, the LEXIS star pagination feature would adversely affect West's market position. "[A] use that supplants any part of the normal market for a copyrighted work would ordinarily be considered an infringement." S.Rep. No. 473, 94th Cong., 1st Sess. 65 (1975), *quoted in Harper & Row Publishers v. Nation Enterprises*, — U.S. ——, 105 S.Ct. 2218, 2235, 85 L.Ed.2d 588 (1985).

MDC asserts that enjoining its use of West page numbers is tantamount to giving West a copyright in the Arabic numbering system. West cannot, MDC argues, claim that its use of the numbering system is an original work of authorship. It is true that some uses of a numbering system cannot meet originality requirements for copyright. See *Toro Co. v. R & R Products Co.*, 787 F.2d 1208 (8th Cir.1986) (arbitrary assignment of random numbers to replacement parts did not qualify for copyright protection). However, as already noted, the copyright we recognize here is in West's arrangement, not in its numbering system; MDC's use of West's page numbers is problematic because it infringes

West's copyrighted arrangement, not because the numbers themselves are copyrighted.

MDC also argues that the LEXIS Star Pagination Feature does not infringe West's copyright because its citations to page numbers in West reporters are merely statements of pure fact. The flaw in this argument is that it does not distinguish between isolated use of the factual aspects of a compilation or arrangement and wholesale appropriation of the arrangement. "Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented." S.Rep. No. 473, 94th Cong., 1st Sess. 65 (1975), *quoted in Harper & Row*, 105 S.Ct. at 2235. The names, addresses, and phone numbers in a telephone directory are "facts"; though isolated use of these facts is not copyright infringement, copying each and every listing is an infringement. See *Hutchinson Telephone v. Fronteer Directory*, 770 F.2d 128 (8th Cir.1985). Similarly, MDC's wholesale appropriation of West's arrangement and pagination for a competitive, commercial purpose is an infringement.[3]

We hold that West's arrangement of cases in its National Reporter System publications is entitled to copyright protection and that the LEXIS Star Pagination feature infringes West's copyright in the arrangement. On the basis of the present record, it is probable that West will succeed on the merits at trial.

## II.

MDC also contends that the District Court did not accurately assess and weigh the three remaining *Dataphase* factors: the threat of irreparable harm to West, the

---

3. In the District Court MDC also argued that its star pagination, like its citation to the first page of West's report of a case, is "fair use" of copyrighted material under 17 U.S.C. § 107. The District Court rejected this contention, noting that MDC's use is commercial, that MDC is appropriating the whole of West's arrangement, and that MDC's use will supersede a substantial

use of West's volumes. 616 F.Supp. at 1580–1581. See *Sony Corp. of America v. University City Studios, Inc.*, 464 U.S. 417, 451, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984); *Harper & Row*, 105 S.Ct. at 2226, 2235. MDC did not raise this issue in its briefs or its argument on appeal, and we find the reasoning of the District Court persuasive.

relative harm to MDC, and the public interest. We disagree.

■ In copyright infringement cases, the general rule is that a showing of a *prima facie* case raises a presumption of irreparable harm. *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir.1983), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). West has made a strong claim for copyright infringement and is therefore entitled to this presumption. Furthermore, MDC's intended use of West's page numbers may significantly affect demand for West's volumes; this further supports West's claim of irreparable injury. See *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). On the other hand, the harm which MDC claims it will suffer is principally loss of the market share and revenues it would garner from use of West's page numbers. Yet, West has demonstrated that it will probably succeed on its claim that MDC's use of West's page numbers is a copyright infringement.

■ Finally, the public interest favors issuing a preliminary injunction. While MDC argues that there is a public interest in free access to the law embodied in West's reporters, we note that West's works are not the only reports of judicial opinions available—MDC itself reports the decisions on LEXIS. More importantly, MDC's argument ignores the purpose of affording authors a monopoly in their copyrightable material; " '[i]f every volume that was in the public interest could be pirated away by a competing publisher, ... the public [soon] would have nothing worth reading.' " *Harper & Row*, 105 S.Ct. at 2230, *quoting* Sobel, *Copyright and the First Amendment: A Gathering Storm?*, 19 ASCAP Copyright Law Symposium 43, 78 (1971).

■ We conclude that the District Court correctly assessed the various *Dataphase* factors and that it did not abuse its discretion in determining that the balance of equities in this case favors issuing a preliminary injunction.

## CONCLUSION

West has shown that it will probably succeed on the merits of its claim at trial; West's case arrangements are entitled to copyright protection and MDC's intended use of West page numbers would infringe West's copyright in its arrangements. The District Court correctly balanced this factor with the threat of irreparable harm to West, the relative harm to MDC, and the public interest to determine that West should be granted a preliminary injunction. Accordingly, the decision of the District Court will be affirmed.

■ We add a word about the procedural posture of this case. It comes to us on appeal from an order granting a preliminary injunction. The case has yet to be tried. We trust it will be tried soon. (Indeed, so far as any requirements of law are concerned, it could have been tried already: the pendency of an interlocutory appeal from an order granting or denying a preliminary injunction does not wholly divest the District Court of jurisdiction over the entire case.) When it is tried, and when judgment is entered, another appeal can be filed. At that time it will be our duty to examine anew, on the basis of the full record, the issues discussed in this opinion. As we have observed before, *e.g., Independent Fed'n of Flight Attendants v. Trans World Airlines*, 655 F.2d 155, 159 (8th Cir.1981), "[t]he District Court's findings, and our observations as to the governing law made in this opinion, are tentative and provisional, in the sense that different findings or conclusions might be warranted after a trial on the merits."

For this reason, the attention of the district courts in this Circuit is called to Fed. R.Civ.P. 65(a)(2), under which, in appropriate cases, those courts have discretion to combine the hearing on a motion for preliminary injunction with the trial on the merits. This procedure is a good one, and we wish to encourage it. In the present case, for example, we got the definite im-

pression at oral argument that most of the evidence on both sides had already been put in. If this is true, the case could have been tried with little additional effort, and the result could have been one appeal instead of two, with a final resolution of the case instead of a provisional one.

Affirmed.

OLIVER, Senior District Judge, concurring in part and dissenting in part.

This case pends on an interlocutory appeal noticed pursuant to Section 1292(a)(1) of Title 28, U.S.C., from a modified order of the district court which "preliminarily enjoined [MDC] from displaying, referencing or including the page number of any and all publications within plaintiff's National Reporter System * * * published during the period from January 2, 1910 to the present within or in relation to the text of court opinions contained in the LEXIS database." Addendum at 25a–26a.[1]

I concur in what the majority stated in regard to the procedural posture of the case and its discussion of Fed.R.Civ.P. 65(a)(2). At 1229. It is my view, however, that the majority's analysis of this case exceeds the limited scope of appellate review provided by a Section 1292(a)(1) appeal.

I therefore dissent because I do not believe, in light of the meager record before the district court, that the majority's analysis is consistent with the applicable law. It is my view that our panel should follow the

lead of the First Circuit as stated in *Building Officials & Code Adm. v. Code Tech, Inc.*, 628 F.2d 730 (1st Cir.1980), in which a not dissimilar question was presented on a Section 1292(a)(1) appeal.

That case, as does this case, involved the application of principles first enunciated in *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834), and later applied in *Banks v. Manchester*, 128 U.S. 244, 9 S.Ct. 36, 32 L.Ed. 425 (1888), and *Callaghan v. Myers*, 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547 (1888). The First Circuit reversed the district court's grant of a preliminary injunction and remanded the case for a trial on the merits without making any definitive ruling on the merits of legal issues presented on the Section 1292(a)(1) appeal that pended in that court.[2]

## I.

### A.

MDC, for reasons I find difficult to understand, invoked the appellate jurisdiction of this Court pursuant to 28 U.S.C. § 1292(a)(1). MDC argued in the district court that the granting of a preliminary injunction restraining MDC from adding the "star pagination" feature "would give West the time it would need to do the considerable work necessary to add its own pagination feature to Westlaw." (App. 103).[3]

MDC obviously invited further delay that would permit West to play catch-up when it

1. The "publications within plaintiff's National Reporter System" were listed as follows: *Supreme Court Reporter, Federal Reporter* and *Federal Reporter Second Series, Federal Supplement, United States Claims Court Reporter, Federal Rules Decisions, Bankruptcy Reporter, Atlantic Reporter* and *Atlantic Reporter Second Series, California Reporter, North Eastern Reporter* and *North Eastern Reporter Second Series, North Western Reporter* and *North Western Reporter Second Series, New York Supplement* and *New York Supplement Second Series, Pacific Reporter* and *Pacific Reporter Second Series, Southern Reporter* and *Southern Reporter Second Series, South Eastern Reporter* and *South Eastern Reporter Second Series,* and *South Western Reporter* and *South Western Reporter Second Series.* Addendum at 26a.

2. The First Circuit concluded that: "We do not agree with the district court's conclusion that BOCA's probability of success on the merits justifies preliminary relief. We stop short, however, of ruling definitely on the underlying legal issues, since we feel that our final judgment should await the more complete hearing on the merits which may be anticipated in due course." 628 F.2d at 732.

3. MDC also complains on appeal that the preliminary injunction granted by the district court gave West "a second chance to play catch-up and develop a feature similar to the LEXIS Star Pagination Feature for West's WESTLAW service." (MDC Brief at 22; *see also* pp. 20–1, 45).

elected to notice a Section 1292(a)(1) appeal in this case. Certainly MDC was not required to notice such an appeal. *See Scarrella v. Midwest Federal Savings & Loan,* 536 F.2d 1207, 1209 (8th Cir.1976), ("[a] party is not required to take an interlocutory appeal authorized by statute").[4] MDC's citation and reliance on *O'Connor v. Peru State College,* 728 F.2d 1001, 1002 (8th Cir.1984), *see* page 24 of MDC brief, establishes that it knew that the scope of appellate review on a Section 1292(a)(1) appeal from an "interlocutory order" is necessarily more narrow than the scope of appellate review of a "final decision" on an appeal taken pursuant to 28 U.S.C. § 1291.

*O'Connor* and *Edudata Corp v. Scientific Computers, Inc.,* 746 F.2d 429, 430 (8th Cir.1984) (per curiam), both cited in the majority opinion (*Supra,* at 1222–23), are but two recent Eighth Circuit cases that recognize the established Eighth Circuit rule in regard to the limited scope of appellate review on a Section 1292(a)(1) appeal.[5]

The majority opinion recognized that the scope of appellate review on a Section 1292(a)(1) appeal is limited and circumscribed. For on page 1229 of the opinion it quoted that portion of *Independent Fed'n of Flight Attendants v. Trans World Airlines,* 655 F.2d 155, 159 (8th Cir.1981), which concluded that "[t]he District Court's findings, and our observations as to the governing law made in this opinion, are tentative and provisional, in the sense that different findings or conclusions might be warranted after a trial on the merits."[6]

---

4. *See also A & R Realty Co. v. Northwestern Mutual Life Insurance Co.,* 95 F.2d 703, 707 (8th Cir.1938); ("if the right to appeal from the interlocutory order was not availed of, the failure to appeal would not diminish the right to a review of such order upon appeal from the final decree"); *Caradelis v. Refineria Panama, S.A.,* 384 F.2d 589, 591, n. 1 (5th Cir.1967); and 9 Moore's Federal Practice ¶ 110.18 (1985), entitled "A Party Is Not Required to Take an Interlocutory Appeal Authorized by Statute," and the cases cited therein.

*Di Giorgio v. Causey,* 488 F.2d 527, 528 (5th Cir.) (1973), appropriately stated that "an appeal from the issuance or denial of a preliminary injunction is ordinarily no way to obtain appellate disposition of a case on its merits." That case emphasized that the "one fact which litigants and their counsel should not overlook is that on an appeal from a preliminary injunction this Court does not concern itself with the merits of the controversy."

5. The Eighth Circuit rule goes back at least as far as Judge Walter Sanborn's opinion in *City of Council Bluffs v. Omaha & C.B. & St. Ry. Co.,* 9 F.2d 246, 249 (8th Cir.1925). *Benson Hotel Corporation v. Woods,* 168 F.2d 694, 697 (8th Cir. 1948), in reliance on *City of Council Bluffs* and other Eighth Circuit cases, made clear that "[t]he decision of the trial court on granting the motion for preliminary injunction will not estop either of the parties on the trial of the case on its merits, nor would any determination of those questions by this court on appeal be binding on the trial court nor upon either of the parties in considering and determining the merits of the controversy." *City of Des Moines v. Continental Illinois Nat. B. & T. Co.,* 205 F.2d 729 (8th Cir.1953), written by Judge John B. Sanborn, stated that "[a]n appellate court, in reviewing an order granting or denying a preliminary injunction, will not consider the merits of the controversy between the parties further than is necessary to determine whether the trial court abused its discretion in making the order and this is particularly true where the rights of the parties can better be determined upon full proof of the facts." 205 F.2d at 733. *And see Mesabi Iron Company v. Reserve Mining Company,* 270 F.2d 567, 570 (8th Cir.1959), which stated that in "the instant case the merits of the crucial issues not having been determined by the trial court, we should not pass upon them" for the reason that "under the well-established rule, to do so would be futile, and we express no opinion on the merits of the issues involved in this case."

The rule established in the earlier Eighth Circuit cases has not been altered. Indeed, *Edudata Corp.* was recently quoted and followed in *St. Jude Medical, Inc. v. Carbomedics, Inc.,* 764 F.2d 500 (8th Cir.1985) (per curiam). *See also Sierra Club v. U.S. Corps of Engineers,* 771 F.2d 409 (8th Cir.1985), which relied on *St. Jude Medical, Inc.* and other recent Eighth Circuit cases to support its conclusion that "[o]ur review of a grant or denial of preliminary relief is limited to determining whether the district court abused its discretion." 771 F.2d at 412. That case also stated that "[w]e are mindful that findings of fact and conclusions of law made by a court in granting or denying a preliminary injunction are not binding at the trial on the merits. *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981)." *Id.* at 413.

6. *Trans World Airlines* stated immediately before the portion of that opinion quoted by the majority that "[w]e emphasize the procedural posture of this case—an appeal from a ruling on

The reason the scope of appellate review on a Section 1292(a)(1) appeal is circumscribed is because the grant of a preliminary injunction by a district court is reviewed solely under an abuse of discretion standard. *Olin Water Services v. Midland Research Lab.*, 774 F.2d 303, 307 (8th Cir.1985), the most recent Eighth Circuit case on that point, concluded that:

> Our *sole* task in reviewing an order of the district court granting a preliminary injunction is to determine whether the court abused its discretion. *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 592 (8th Cir.1984); *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 & n. 8 (8th Cir.1981) (en banc); *accord University of Texas v. Camenisch*, 451 U.S. 390, 393, 101 S.Ct. 1830, 1832–33, 68 L.Ed.2d 175 (1981). (Emphasis added).

Any possible doubt about the limited scope of review on a Section 1292(a)(1) appeal, in my view, was resolved by *University of Texas v. Camenisch, supra*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). That case held that "the issue before the Court of Appeals [on an appeal from an order granting a preliminary injunction]

was * * * whether the District Court had abused its discretion in issuing a preliminary injunction." [7] *Id.* 451 U.S. at 393, 101 S.Ct. at 1832.

While I concur in the majority's recognition of the established Eighth Circuit rule, I am not able to join the majority opinion because that opinion exceeds the limited scope of appellate review accorded by a Section 1292(a)(1) appeal.[8] The majority opinion, as I read it, states much more than a tentative view of the merits of this case.

### B.

I concur with what the majority stated in its final paragraph in regard to the utilization of Fed.R.Civ.P. 65(a)(2). I quite agree that if the hearing on West's application for a preliminary injunction had been consolidated with an advanced trial on the merits, that the entire case could have been tried with little additional effort, with the result of having one rather than two appeals. This case, in my view, is precisely the type of case in which Rule 65(a)(2) should have been used. For it is reasonably certain that once this case is tried on the merits, the losing party will notice a second appeal of right under Section 1291.[9]

a motion for preliminary injunction. In this situation *our reviewing function is circumscribed."* (Emphasis added).

**7.** *Alabama v. United States*, 279 U.S. 229, 49 S.Ct. 266, 73 L.Ed. 675 (1929), cited with approval in *University of Texas*, concluded that the duty of the appellate court upon an appeal from an order either granting or denying an interlocutory injunction "at least generally, is not to decide the merits but simply to determine whether the discretion of the court below has been abused." 279 U.S. at 230–31, 49 S.Ct. at 266.

**8.** I recognize, of course, that MDC, like the Section 1292(a)(1) appellant in *Di Giorgio*, tended to brief and argue this appeal "as if it were from a final judgment on the merits." 488 F.2d at 528. Although MDC cited *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir.1981) (en banc), it is clear that the major portion of MDC's argument was made under a bold face heading which argued that **"The District Court Erred in Concluding That the LEXIS Star Pagination Feature Infringes Copyrights Claimed by West."** That MDC did so

does not, in my judgment, expand the circumscribed scope of appellate review applicable to a Section 1292(a)(1) appeal.

**9.** The Fifth Circuit in *Di Giorgio* appropriately noted that it was encountering Section 1292(a)(1) appeals with "more and more frequency." It then pointed out that "[w]e note that while such appeals are pending the general tendency is to allow the case on the merits to lie dormant. Then, after the lapse of considerable time, it is found that two appeals are required for the disposition of the case. This causes frustration attributed to judicial delays, when the fault lies not with the judiciary, beleagured though it is by an unprecedented torrent of cases." 488 F.2d at 529.

The "torrent of cases" the Fifth Circuit noted in 1973 continues unabated in 1986. The Director of the Administrative Office has recently noted that "between 1969 and 1985 * * * appeals filings are up 226 per cent." 18 *The Third Branch*, No. 8, p. 6 (August 1986). I do not believe that parties should be encouraged to notice Section 1292(a)(1) appeals. For the determination of such an appeal, absent exceptional circumstances, can serve no useful purpose

## II.

### A.

Neither the district court nor the majority discussed any part of the record before the district court to support their respective conclusions that West, on the merits, will probably succeed in proving as matters of fact, that (1) West's arrangement of the cases in all of its publications since January 8, 1910 to the present may be subject to copyright; (2) that West's pagination of all those publications is an important part of such an arrangement and that, as such, is also subject to copyright; and (3) that MDC's intended use of star pagination may be said to constitute an infringement of West's copyright of àll its post-January 2, 1910 publications.

Although West relied on *Hutchinson Telephone Co. v. Fronteer Directory Co.,* 770 F.2d 128 (8th Cir.1985) (Tr. 11), in the district court, that court did not make any findings of fact or indicate in any way that it believed that the publication of a law report could be said to be comparable to the publication of a telephone directory.

The majority cited and relied on *Hutchinson,* both in regard to its discussion of "copyright protection," at 1223, and in discussion of "infringement," at 1227 and 1228. The majority, however, like the district court, did not make any reference to the record to support its ultimate concurrence with "the District Court's conclusion that West's arrangement is a copyrightable aspect of its compilation of cases, that the pagination of West's volumes reflects and expresses West's arrangement, and that MDC's intended use of West's page numbers infringes West's copyright in the arrangement." *Supra* at 1223.

for either the parties, the district court, or for a later panel of the Court of Appeals that will, in many, if not most cases, be required to rule a second appeal noticed under Section 1291.

**10.** The record in this case does not contain any copies of a Certificate of Registration for any volume in which a State court opinion is published. Thus it is impossible to know what claims of copyright West may have made in regard to its reports of State court opinions.

I find nothing in the record to support the requisite findings of fact upon which both the district court's and the majority's conclusions of law are based. This is not a case, in my judgment, that permits an application of the clearly erroneous standard of Fed.R.Civ.P. 52(a) because the district court did not make any findings of fact in regard to the relevant factual circumstances of this case. Further, as a member of the panel that decided *Hutchinson,* I am satisfied that case should be distinguished from this case on much the same grounds it was recently distinguished in *Toro Co. v. R & R Products Co.,* 787 F.2d 1208, 1213 (8th Cir.1986).

West's arrangement of cases, however that arrangement may be made, is contained in each volume of its various publications. West has no general copyright on its "National Reporter System"; each separate volume published by West carries its own individual copyright. Most, but not all, of the exceedingly few Certificates of Copyright Registration in the record establish that West has recognized that it may not obtain a copyright on the major part of what it published in a particular volume of any one of those law reports.[10]

The record shows, for example, that although West claimed authorship of the "entire work" encompassed in Volume 753 F.2d, West's Certificate of Registration Form TX 1–607–203 (Exh. 3, A63) did not make any claim of copyright for the page numbers that the majority opinion concluded was "an important part" of the whole of such a Volume.[11] One of the questions on the copyright registration form required West to "[g]ive a brief, general statement of the material that has been added to this work and in which copyright is claimed"

The record includes copies of only twelve of West's Certificates of Copyright Registrations for volumes in which lower federal court decisions are published. *See* Exhibits 1–12 (A59–A80).

**11.** West's Certificate of Copyright Registration expressly stated that "[c]opyright is not claimed as to any part of the original work prepared by a United States Government officer or employee as part of that person's official duties." (A64).

(A64). West's answer stated "[c]ompilation of previously published case reports including but not limited to opinions, synopses, syllabi or case law paragraphs, key number classifications, tables and index digest, with revisions and additions." [12] (A64).

West stated on Form TX 1–607–203 that the "Title of the Work" was "Federal Reporter. Second Series. Volume 753 F.2d." The title to a law report is obviously a very important part of the whole of such a volume, however the published court opinions may be arranged.[13] Yet, it is beyond dispute, I believe, that the title to a volume of law reports, certainly a most important part of the whole volume, simply is not subject to copyright. *See* 1 *Nimmer on Copyright* "Titles," § 2.16, p. 2–186 and the cases cited therein, including *Duff v. The Kansas City Star*, 299 F.2d 320 (8th Cir.1962).

The fact that the sequential numbering of the pages of any volume, including a volume of law reports, is an important part of the volume, does not support a finding of fact that such a part of the whole of a particular volume of West's publications is subject to copyright. Nor, in my judgment, does such a fact support a finding of fact that West's arrangement of cases is subject to copyright. All parts of a copyrighted volume may not be automatically considered a subject to copyright simply because a publisher claims a copyright on the whole volume.

## B.

Nor does the record, as I read it, support any finding of fact upon which the majority could base its conclusion that "the LEXIS Star Pagination feature infringes West's copyright in the arrangement." [14] At 1228. I hold that view even if it is assumed that the majority's assumption that West's pagination, as an "important part" of a West publication, is entitled to copyright may be valid. For I do not believe that anything in the sketchy record in this case can support a factual finding that MDC's intended star pagination of West's published court opinions would in any way infringe West's "arrangement of cases."

The record, as I read it, merely establishes that MDC only intends to add star pagination to the court opinions contained in its LEXIS data base. MDC, as I understand the record, does not intend to make, nor has it in fact made any use of West's "synopses, syllabi or case law paragraphs, key number classifications, tables and index digest, with revisions and additions" for which West claimed in its Certificates of Copyright Registration. The record, as I read it, cannot be said to support a finding of fact that MDC intends in any way to duplicate or reproduce West's "arrangement of cases," whatever those arrangements may be.

Thus, on the district court's record, the ultimate question presented on this Section 1292(a)(1) appeal is reduced to whether,

---

**12.** West's limited claim of copyright for other of its federal court reports is made in similar language in Exhibits 4 to 12, inclusive. Exhibits 1 and 2 are claims for the renewal of copyrights first registered on January 14, 1925 and November 5, 1924, respectively. The record does not show what claims of copyright were made in regard to the original registration of those volumes.

**13.** In 1880, West Publishing Company reprinted all previously reported lower federal court decisions between 1789 and 1879 in one set of 31 volumes called *Federal Cases*. "Unlike most sets of court reports where the cases are arranged chronologically, the decisions in this set are arranged alphabetically by name of case and are numbered consecutively." Jacobstein and

Mersky, *Fundamentals of Legal Research*, (The Foundation Press, 1981) at 36. When West commenced publication of its *Federal Reporter* series in 1880, the cases were "arranged" in a more traditional manner. The record shows West claimed in its Preface to its *Federal Reporter* series that "within a few years" after 1880, West "came to be recognized as the official Reporter of the Federal Courts." (Add. 46a).

**14.** I have the same view in regard to the district court's conclusion, unsupported as it is by any reference to the record, that "the use of the second and succeeding numbers following the initial citation to West's arrangement, the so-called 'jump cite' (i.e. 479 F.2d 701, 702), infringes on West's copyright." 616 F.Supp. at 1579.

under the applicable law, MDC's intended use of West's page numbers, standing alone, may be said to infringe some copyright to which West may be entitled under factual circumstances yet to be established on a trial of the merits of this case. It cannot be said that it is probable that West will succeed on the merits unless it can also be said that West will be able to establish that its page numbers are entitled to copyright; one simply cannot infringe a non-existent copyright.[15]

The probability of whether West will succeed on the merits must, in my judgment, be viewed in light of the fact that law book publishers in the United States have long and traditionally used star pagination in their publication of court opinions which have been taken verbatim from earlier published and copyrighted works of both official and unofficial court reporters.[16] I do not believe that the record in this case can be said to support a *Dataphase* conclusion that West will probably succeed on the merits when that record can be said only to support a finding of fact that MDC intends to do no more than what other law book publishers have been doing for a long, long period of time.

### C.

Both the district court and the majority referred to the works of Shakespeare to support the granting of the preliminary injunction in this case.[17] Whether a new "compilation" of Shakespeare's work may, in fact, be subject to copyright as an original work of authorship does not answer the question of whether West's "page numbers *and* its arrangement are *necessarily* within the scope of copyright protection," as the district court concluded. 616 F.Supp. at 1577. Neither the district court nor the majority cite any cases which suggest that the page numbers of a new compilation of any work of Shakespeare must be considered a subject of copyright. Nor is any authority cited to support the notion that the citation of the page numbers in a copyrighted compilation of Shakespeare's work would somehow infringe an earlier publication of Shakespeare's plays and sonnets. Current literary practice suggests that such page citations may not be said to constitute an infringement.[18]

A judicial opinion cannot, under *Wheaton v. Peters* be considered a subject of copyright. Nor, in my view, may a compilation of judicial opinions be considered a subject of copyright unless such a work is "formed by the collection and assembling of preexisting materials or of data that are * * * *arranged* in such a way that the resulting work *as a whole constitutes an original work of authorship."* 17 U.S.C. § 101. (Emphasis added).[19]

---

**15.** The majority more or less agrees that this is true. For it stated that if MDC's position is that "all West seeks to protect is numbers on pages * * * is a correct characterization, MDC wins: two always comes after one, and no one can copyright the mere sequence of Arabic numbers." At 1226.

**16.** Indeed, it is apparent that West has long used and presently uses star pagination in the court opinions published in its *Supreme Court Reporter,* its *New York Supplement,* and its *California Reporter.*

**17.** The district court stated that unless "West's page numbers *and* its arrangement of cases" are considered "necessarily within the scope of copyright protection," that "one could not collect Shakespeare's plays—themselves not subject to copyright—into a copyrighted work." *Id.* at 1577. The majority stated that an "arrangement of opinions in a case reporter, no less than a

compilation of Shakespeare's sonnets, can qualify for a copyright protection." At 1224.

**18.** My copy of John Bartlett's *Familiar Quotations* (Eleventh ed. Little, Brown and Company 1939), for example, shows that the quotations from Shakespeare's plays and sonnets in that work contain "jump cites" to the Act, the Scenes, and the Lines of the text of the plays and sonnets as earlier published in W.J. Craig's *The Complete Works of Shakespeare,* copyrighted by Oxford University Press. I seriously doubt that the addition of a page number citation by Bartlett to the other citations to Craig's earlier work would constitute an infringement of Oxford University Press' copyright.

**19.** Section 103 makes clear that "copyright in a *compilation or derivative work extends only to the material contributed by the author of such work,* as distinguished from the preexisting material employed in the work, and does not imply

While there may be some interesting copyright questions presented in regard to a compilation of Shakespeare's work,[20] I do not believe that the references made to his work can be said to support the view of either the majority or that of the district court.

## III.

### A.

The district court recognized that "this case turns on whether or not the succeeding numbers themselves are protected by copyright,"[21] 616 F.Supp. at 1579. It stated, however, that the "Court *finds* two cases of particular interest and importance in providing an analytic framework in which to consider the claims of the parties," citing *Callaghan v. Myers*, 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547 (1888), and *Banks Law Pub. Co. v. Lawyers Co-operative Pub. Co.*, 169 F. 386 (2nd Cir.1909). *Id.* at 1575–76. (Emphasis added). The district court also stated that "this Court *finds* that *Callaghan* supports and *Banks* does not bar copyright protection for West's laboriously prepared, voluntary arrangement of cases." [22] *Id.* at 1578. (Em-

phasis added). The district court further recognized, however, that even under its reading of *Callaghan*, that the Court held in that case that "[i]f the arrangement of cases and the paging of the book depend simply on the will of the printer, or the order in which the cases have been decided, or upon other accidental circumstances, they of course are not subject to copyright protection because they then involve no labor, talent, or judgment." *Id.* at 1576.

To support the issuance of its broad preliminary injunction the district court stated that West's pagination "is not just a series of numbers each arising by one over its predecessor." Without any reference to the record, the district court further stated that such pagination "is the basis of the West arrangement—the key to the self-index by which West's arrangement is accessed." [23] *Id.* at 1579.

The district court then stated that "[t]his is, the Court *finds*, what is meant by the words 'taken as a whole' in the copyright definition of 'compilations,'" citing 17 U.S.C. § 101. *Id.* (Emphasis added).[24] The district court concluded as a matter of

---

any exclusive right in the preexisting material." (Emphasis added).

**20.** 1 *Nimmer on Copyright,* § 201[A], pp. 2–9, put and answered the following question in regard to an original work of Shakespeare:

Suppose a scholar were to painstakingly explore the stacks of the British Museum for a number of years, and finally after much effort find that which he was seeking, *i.e.,* a forgotten Shakespeare manuscript. The scholar may well have exercised much skill, training, knowledge and judgment, but should this entitle him to a copyright in the manuscript? Clearly not, since he did not engage in any act of authorship.

*See also* Judge Learned Hand's comment in regard to Keats' work in *Sheldon v. Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 54 (2d Cir. 1936), *aff'd,* 309 U.S. 390, 392, 60 S.Ct. 681, 84 L.Ed. 825 (1940), where he stated that " * * * if by some magic a man who had never known it were to compose anew Keats's Ode On a Grecian Urn, he would be an 'author,' and, if he copyrighted it, others might not copy that poem, though they might of course copy Keats's."

**21.** The district court also purported to recognize that "[i]t is beyond cavil that one cannot copy-

right the arabic numbering system." *Id.* at 1579.

**22.** The district court, of course, was stating a conclusion of law rather than making a finding of fact in stating its view in regard to what *"Callaghan* supports" and what *"Banks* does not bar." The same thing is true of its statement that it "finds" that *Callaghan* and *Banks* are of "particular interest and importance in providing an analytic framework" for its decision of this case.

**23.** The district court did not explain what a "self-index" might be or how an arrangement of cases may be "accessed."

**24.** That "finding," like the others above noted, is actually a statement of a conclusion of law. That conclusion of law, in my judgment, is not tenable for the reason the words *"taken* as a whole" do not appear in Section 101's definition of a "compilation." That definition expressly provides that a "compilation" is a work "arranged *in such a way that the resulting work as a whole constitutes an original work of authorship." Id.* (Emphasis added).

law, without any reference to the record, that "West's page numbers *and* its arrangement of cases are *necessarily* within the scope of copyright protection." *Id.* at 1577. (Emphasis added).

I do not agree that *Callaghan* and *Banks* provide "an analytic framework in which to consider the claims of the parties." *Id.* at 1576. Nor do I agree that "West's page numbers *and* its arrangement of cases are *necessarily* within the scope of copyright protection." *Id.* at 1577. (Emphasis added).

### B.

The record in this case does not indicate in any way how or by whom West's page numbers are, in fact, created. West's affidavits do not identify any person as the "author" of any of the page numbers. The only thing the record in this case shows, as I read it, is that West's bound volumes carry the same volume numbers and the same page numbers as West's advance sheets.[25] How those page numbers are assigned West's advance sheets is a total mystery so far as the record is concerned.

Judicial notice may be taken of the fact that the original page numbers that appear on a slip opinion submitted by a judge for publication never appear in any West advance sheet.[26] There is indeed substantial doubt whether those page numbers could be considered part of the judge's work of authorship. For the pagination of a

judge's slip opinion is, at best, the work of a judge's secretary or, in this day of advanced technology, the work of the secretary's word processor in electronic response to the secretary's punch of a button on a machine.[27]

Thus, the factual question in regard to how or by what process, electronic or otherwise, West assigns a completely new set of page numbers to a judge's slip opinion is an open factual question that can only be determined on a trial of the merits. It is my view that West's probability of success on the merits simply cannot be measured on a record that does not provide any information in regard to whether West's new advance sheet pagination, like a judge's secretary's original pagination of his slip opinion, is nothing more than an electronic response to a direction given a machine or whether, as a matter of fact, West's new pagination may be considered an original work of authorship.

If, on the trial of the merits, it is established that West's new page numbers are assigned a judge's slip opinion by some automatic electronic process, it is inconceivable to me that the public policy that denies all right of copyright to a court opinion would nevertheless grant copyright to the page numbers of the volume in which such a court opinion is published. Therefore, I do not believe that the district court's discussion of *Callaghan* and *Banks* within the structure of its "analytic framework" can be said to support its *Dataphase* con-

---

25. The Berring affidavit (A31–39), for example, simply states that West "arranges American judicial decisions within its National Reporter System publications" (A34 ¶ 13). There is no statement made in regard to how those cases are "arranged" or, more particularly, how the page numbers are placed in any of West's volumes.

The only mention of West's pagination is in paragraph 16 of the affidavit which states that there is, in fact, "identical numbering and paging of the volumes in both the advance sheets and the permanent, hardbound editions." (A38).

The Ginnow affidavit (A40–48) is likewise silent in regard to how, when or by whom the page numbers are, in fact, placed on West's volumes. Ginnow's affidavit, like that of Berring, simply reiterated that "decisions published in [West's] hard-bound, permanent volumes retain the same volume number and pagination

used in the advance sheet volumes" and that "each volume in every Reporter series retains identical pagination between advance sheet volume and permanent volume to promote reliable and consistent citation." (A48, ¶ 24 and 25).

26. The page numbers on this slip opinion, for example, will, like Clementine, be lost and gone forever once the opinions in this case are published in a West advance sheet.

27. This is also true where the judge drafts his opinion in long hand and "authors" the page numbers on his legal pad. For his secretary does not copy the judge's page numbers when the judge's long hand draft is transcribed; the secretary or the word processor, rather than the judge, is the "author" of the page numbers on the slip opinion in its typewritten form.

clusion that West will probably succeed on the trial of the merits of this case.

### C.

It is my view that the majority's analysis is based on what I believe is an incomplete and untenable view of *Callaghan* and *Banks.* Although the majority, in its discussion of *Banks* stated that "we would be inclined to examine the official reporter's independent efforts in arrangement and pagination on their merits to see if they meet originality and intellectual-creation requirements," at 1226, and although it stated that *"Callaghan* establishes at least that * * * in each case the arrangement must be evaluated in light of the originality and intellectual-creation standards," at 1225, the majority nevertheless definitely concluded that "West's case arrangements, an important part of which is internal page citations, are original works of authorship entitled to copyright protection."[28] At 13.

The majority, I believe correctly, concluded that "the treatment of case arrangement and pagination in *Callaghan* was not crucial to the Court's decision."[29] At 1224. The majority nevertheless concluded, I believe erroneously, that we must "follow the Supreme Court" for the reason that *"Callaghan* does not seem so hostile to the very idea that case compilation, arrangement, *and* paging can be protected by copyright." *Id.* at 1226. (Emphasis added).

The majority recognized that *Toro Co. v. R & R Products Co., supra,* 787 F.2d 1208,

had most recently held that "some uses of a numbering system cannot meet originality requirements for copyright."[30] At 1228. It, however, purported to distinguish *Toro Co.* by stating that "the copyright we recognize here is in West's arrangement, *not* in its numbering system; MDC's use of West's page numbers is problematic because it infringes West's copyrighted arrangement, *not because the numbers themselves are copyrighted." Id.* at 1228. The majority therefore concluded that the principles of copyright law stated in *Hutchinson* rather than those stated in *Toro Co.* were applicable to this case. I disagree.

In *Hutchinson,* this court recognized that the principle that "telephone directories and similar publications" were subject to copyright was established by a "long line of cases." *Hutchinson,* of course, was based on and merely extended that "long line of cases." *Leon v. Pacific Telephone Co.,* 91 F.2d 484, 486, (9th Cir.1937), the first case cited and relied upon in *Hutchinson,* quoted Justice Holmes' statement made in 1903 in *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 250, 23 S.Ct. 298, 300, 47 L.Ed. 460 (1903), that "directories and the like, * * * may be copyrighted." *Sampson & Murdock Co. v. Seaver-Radford Co.,* 140 Fed. 539, 542 (1st Cir.1905), also cited in *Leon,* traces the origin of the directories' rule back to at least 1839.[31]

Professor Nimmer puts the directory cases in an entirely different category from

---

**28.** The majority stated that the "key to this case * * * is *not* whether numbers are copyrightable, but whether the copyright on the books *as a whole* is infringed by the unauthorized appropriation of these particular numbers." (Emphasis added). At 1227. The majority also stated that "we concur in the District Court's conclusion that West's arrangement is a copyrightable aspect of its compilation of cases, that the pagination of West's volumes reflects and expresses West's arrangement, and that MDC's intended use of West's page numbers infringes West's copyright in the arrangement." At 1223. It further stated that "we agree with the District Court that * * * the denial of copyright protection in *Banks* was based upon the official status of the reporter." At 1225.

**29.** The majority's suggestion that the "teaching of *Callaghan* with respect to the issues before us does not come through with unmistakable clarity," at 1225, was not made in regard to its recognition that "the treatment of case arrangement and pagination was not crucial to the Court's decision" in *Callaghan.*

**30.** The majority further stated that "no one can copyright the mere sequence of Arabic numbers." At 1227. The preliminary injunction issued by the district court, of course, granted precisely that protection; that interlocutory order did not so much as mention West's arrangement of cases.

**31.** That case held that "[d]irectories and works of like character have been specifically protect-

the cases involving the publication of law reports.[32] The fact that the slight amount of intellectual labor necessary to produce a plat map may be considered sufficient to establish copyright, as illustrated by *Rockford Map Pub. v. Dir. Service Co. of Colorado*, 768 F.2d 145 (7th Cir.1985) (cited by the majority, at 1223 and 1226), does not, in my judgment, support the majority's conclusion that *Banks* "requires a greater degree of intellectual creativity than the trend of the modern cases." *Id.* at 1225–1226.

I find nothing in the record in this case to support a finding of fact that it takes more intellectual creativity to put page numbers on a volume of law reports today than it did in the yesterdays in which *Callaghan* and *Banks* were decided in 1888 and 1909, respectively. Indeed, the trial on the merits of this case may establish that West's pagination is no more than the work of a machine responding to a punch of a button, rather than the exercise of the will of a printer, who yesterday, was at least required to set type for the pagination of a volume of law reports.

### IV.

I do not agree with the majority's statement that "the denial of copyright protection [in *Banks* ] was based upon the official status of the reporter," at 1225; its statement that *Banks* "diverges from *Calla-*

ghan"; or its conclusion that *Callaghan*, as a Supreme Court decision, must therefore be followed rather than *Banks*. *Id.* at 1226.

Professor Nimmer makes clear that the judicial opinions of both state and federal courts are in the public domain and are therefore not subject to copyright. 1 *Nimmer on Copyright*, § 5.06[C] at 5–58—5–59 (1985). Professor Nimmer cited *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 8 L.Ed. 1055 (1834), to support his conclusion in regard to federal court opinions. *Banks v. Manchester*, 128 U.S. 244, 9 S.Ct. 36, 32 L.Ed. 425 (1888), and *Building Officials & Code Administrators International, Inc. v. Code Technology, Inc.*, 628 F.2d 730 (1st Cir.1980), were cited in regard to state court opinions; the latter was cited "for a discussion of the older cases." *Id.* at 5–58, n. 30. *Callaghan*, together with a "see" citation to the Second Circuit's opinion in *Banks*, and a "cf." citation to *Wheaton v. Peters*, was cited to support Professor Nimmer's statement that: "With respect to the public domain status of judicial opinions, somewhat anomalously the older decisions held that an official reporter paid by the state may personally claim copyright in the headnotes and synopses of court opinions, written as a part of his official duties, in the absence of an agreement to the contrary." *Id.* at 5–60, n. 32.

*Banks v. Manchester*, which the Court decided in tandem with *Callaghan*, was not

---

ed, at least since *Lewis v. Fullarton*, 2 Beav. 6, decided in 1839, and that they are to be protected is now firmly established." *Jeweler's Circular Pub. Co. v. Keystone Pub. Co.*, 281 Fed. 83, (2d Cir.), *cert. denied*, 259 U.S. 581, 42 S.Ct. 464, 66 L.Ed. 1074 (1922), was also cited in *Leon.* That case was decided by the same panel that decided *Banks.* Judge Henry Wade Rogers concluded that "[i]t was at one time intimated in certain judicial opinions that directories were not entitled to copyright. But the law is now well established to the contrary in England. [Citing many English cases]. It is equally well-established law in this country. [Citing many federal cases]. And in *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 250, 23 S.Ct. 298, 47 L.Ed. 460, Mr. Justice Holmes, writing for the court, speaks of directories as being capable of copyright." *Id.* at 85.

Judge Rogers treated *Callaghan* in substantially the same manner *Callaghan* would be treated

two years later in *Eggers v. Sun Sales Corporation*, 263 Fed. 373 (2d Cir.1920). The *Jeweler's Circular* court quoted Justice Blatchford's observation that, on the facts of *Callaghan*, "one of the most significant evidences of infringement exists frequently in the defendant's volumes, namely the copying of errors made by Mr. Freeman." *Id.* at 95.

**32.** 1 *Nimmer on Copyright*, § 2.04[B], pp. 2–40—2–42, discusses "catalogs and directories" and states that "[a]lthough some may question whether catalogs, directories and the like should be regarded as works of authorship subject to copyright protection, such protection has long been recognized, so that the present Copyright Act breaks no new ground in this respect." Professor Nimmer does the same thing in regard to "maps." *Id.* § 2.08[A], p. 2–75 to 2–82.

cited or discussed by the majority. Both cases must, in my view, be given appropriate consideration, for both applied the principles of law established in *Wheaton v. Peters.* The majority opinion has not, in my view, given appropriate consideration to or recognition of the rationale of the three Supreme Court cases that control the determination of this case.

Part III of Professor Craig Joyce's article *The Rise of the Supreme Court Reporter: An Institutional Perspective on Marshall Court Ascendancy,* 83 Mich.L. Rev. 1291, 1351 to 1391 (1985) (hereafter cited as Joyce), is devoted to *Wheaton v. Peters.*[33] While I agree with Professor Joyce's suggestion that "[f]ew cases tell stories so fascinating as *Wheaton v. Peters,*" *id.* at 1391, it is sufficient for present purposes to state that Peters, shortly after he succeeded Wheaton as the Court's official reporter, decided to publish a work entitled the *Condensed Reports of Cases in the Supreme Court of the United States, Containing the Whole Series of the Decisions of the Court From Its Organization to the Commencement of Peters's Reports at January Term 1827.* Peters' motive was basically a commercial one.

A glance at any one of Wheaton's *Reports* shows that the scholarly Wheaton, aided and encouraged by Justice Story, included elaborate head notes, a full summary of the arguments of counsel, together with a large number of appendices in the twelve volumes of Supreme Court reports he published between 1816 and 1827. The inclusion of that material in those volumes substantially increased the cost of Wheaton's *Reports.*[34] Peters compressed the twenty-four volumes of opinions published by all three earlier reporters into only six volumes of his *Condensed Reports,* which he published between 1830 and 1834. He was able to reduce the price for all the Court's opinions from $130 to $36 for his reports by using smaller type, omitting the arguments of counsel and appendix notes, and by substantial elimination of some concurring and dissenting opinions. *Id.* at 1365.

Both Justice Story and Justice Washington "enthusiastically supported Peters' undertaking." *Id.* at 1366. Wheaton's adverse reaction was predictable.[35] Wheaton employed Elijah Paine and Daniel Webster to represent him. In May, 1831 Wheaton filed a bill in equity in the Circuit Court for the Eastern District of Pennsylvania "praying for an injunction to prevent the further printing, publication or sale of volume 3 of the *Condensed Reports* and an accounting of profits." *Id.* at 1370. That bill alleged that volume 3 of *Peters' Condensed Reports* "contained 'without any material abbreviation or alteration, all the reports of cases' in volume 1 of Wheaton's *Reports.*" *Id.* at 1370.[36] A preliminary injunction was initially issued by Justice Baldwin, sitting as a Circuit Justice with Judge Hopkinson, but was dissolved two years later by Judge Hopkinson who acted alone during one of Justice Baldwin's not infrequent "derangement of the mind." *Id.* at 1371. The case

**33.** A shorter version of Professor Joyce's research was also published under the title of *Wheaton v. Peters: The Untold Story of the Early Reporters* in Yearbook 1985 of the Supreme Court Historical Society, pp. 34–92. Part III of the Yearbook article is substantially the same as Part III of the Michigan Law Review Article.

**34.** To obtain copies of all the Court's opinions since 1790, one would be required to purchase three volumes of Dallas' *Reports,* nine volumes of Cranch's *Reports,* and the twelve volumes of Wheaton's *Reports,* at a total cost of $130.

**35.** Joyce states that: "Wheaton, * * * first learned of Peters' plans from [his publisher] who informed him also that the proposal had

put almost an entire stop to the sales of both the *Reports* and the *Digest of Decisions.*" *Id.* at 1376. Wheaton's publisher urged Wheaton to bring an action for infringement pointing out that "until an example is made of these literary Pirates there can be no security for the labours of authors and Publishers." *Id.* at 1376.

**36.** Although I do not believe it legally significant, except to the extent it may relate to the majority's preoccupation with whether a reporter may or may not be an "official" reporter, it is to be noted that Wheaton was *not* an official reporter of the Court when he published Volume 1 of his reports. Volume 1 of Wheaton's *Reports* was published in 1816 before the Reporter's Act became effective on March 3, 1817.

then went on direct appeal to the Supreme Court.

Joyce accurately stated that "Wheaton's central point [on appeal]—that the decisions of the Court as rendered by the Reporter had always been regarded as subject to copyright by him—was not without substantial foundation." [37] *Id.* at 1373. Wheaton's counsel recognized, however, that "unless Wheaton had somehow obtained copyrights in the manuscript opinions of the Justices in every significant decision handed down during his tenure as Reporter, the *Condensed Reports* had infringed no interest of any real value in the marketplace." *Id.* at 1377. Wheaton's counsel therefore argued that "Wheaton had acquired a copyrightable interest in all such opinions * * * 'by judges' gift.' " [38] *Id.* at 1377.

Thomas Sergeant argued on behalf of Peters that, as a matter of public policy, the opinions of the Court must be considered to be in the public domain and not subject to copyright. *Id.* at 1378. After listening to four days of oral argument, the Court convened on March 19, 1834 to announce their opinions.[39] Joyce accurately stated that "McLean's [majority] opinion left open the possibility that a tiny, unspecified portion of the matter claimed by Wheaton as author—* * * 'the statements of the cases … and the abstracts thereof' —might indeed have been infringed by Peters." [40] *Id.* at 1384. He added, however, that for "all practical purposes," * * * the controversy had come to an end when McLean stated that:

> It may be proper to remark that the court are unanimously of opinion, that no reporter has or can have any copyright in the written opinions delivered by this court; and that the judges thereof cannot confer on any reporter any such right.

*Id.* at 1385.

Although both Justices Thompson and Baldwin dissented in regard to other issues

---

**37.** Joyce explained that "Wheaton's expectations regarding the copyrightability of his *Reports* had an entirely reasonable basis." *Id.* at 1374. In a preargument memorandum Wheaton wrote Daniel Webster, he recognized that it could be held that the opinions of the Court may not be subject to copyright. Wheaton recognized that if the Court should so hold, he would be "reduced to arguing that the *Reports,* because they included parts individually susceptible to copyright, constituted compilations entitled to protection in their entirety." *Id.* at 1374.

The majority opinion, as I read it, is based on its acceptance of Wheaton's argument, which was rejected by the Supreme Court.

**38.** Paine argued in part that "[w]ere not the opinions of the judges their own to give away? Are opinions matter of record, as is pretended? * * * [T]here is no law or custom to put opinions upon record, * * * Nor were they ever put on record in this case. * * * The copy[right] in the opinions, as they were new, original and unpublished, must have belonged to some one. If to the judges, they gave it to Mr. Wheaton. That it did belong to them is evident; because they are bound by no law or custom to write out such elaborate opinions. * * * What right, then, can the public claim to the manuscript? The reporter's duty is to write or take down the opinions. If the court choose to aid him by giving them theirs, can anyone complain?" That argument is reported in 33 U.S. (8 Pet.) at 614.

**39.** On March 18, 1834, after oral arguments were closed on March 14, 1834, Justice Story took the extraordinary action of conducting a conference with both Wheaton and Peters the day before the Court handed down its decision to try to get them to settle their controversy. Story gave both men a copy of a memorandum which advised the parties that the decision of the Court, if handed down, would unanimously hold that no right of property did or could exist in the Court's opinions, and that the Justices were without power to confer upon its Reporters any copyright thereto. As to the marginal notes and indices prepared by Wheaton, however, the Court had touched upon but not finally determined the litigants' rights. "Under the circumstances," the memorandum concluded, "the Court thinks, that it is a fit subject for honourable compromise between the parties." *Id.* at 1380. On the advice of Webster, Wheaton rejected the suggested compromise.

**40.** Joyce also noted that "[i]n his dissent, Justice Baldwin carefully noted that, in the proceedings on remand, Wheaton might still prove his rights to literary property in 'the marginal notes, or syllabus of the cases and points decided, the abstract of the record and evidence, and the index to the several volumes.' 33 U.S. (8 Pet.) at 698g (F. Brightly ed. 1883)." *Id.* at 1384–85 n. 515.

# 1242

decided in *Wheaton v. Peters*, Joyce appropriately noted that "on the decision's central point—the noncopyrightability of the opinions of the Justices—there was unanimity: the Court could allow no impediment to the fullest possible dissemination of its judgments." *Id.* at 1390.

The impact of *Wheaton v. Peters*, in my judgment, has been both broad and lasting.[41] The concluding sentence of Justice McLean's opinion destroyed "a presumption of ownership, long shared by Wheaton, his predecessors and the Justices themselves, which if given the force of law would have bestowed upon the Reporters of the Supreme Court exclusive title to those classic expressions of American law that constitute the Court's essential legacy to the nation." *Id.* at 1386.

In 1883, West published the annotation "Literary Property at Common Law," 17 Fed. 593 (1883), authored by Henry Wade Rogers.[42] Rogers quoted the concluding sentence of *Wheaton v. Peters*, and added that "[a]ll that the reporter can copyright is his own individual work—the head-notes, the statement of the case, analysis or summary of the arguments of counsel, the index, etc." *Id.* 33 U.S. (8 Pet.) at 596.[43]

Although the majority cited and quoted a short portion of *Wheaton v. Peters* in a footnote, at 1223, n. 3, it did not discuss that leading case in any detail. It did not even cite *Banks v. Manchester*. Rather, the majority discussed *Callaghan* in a manner that suggested that *Callaghan* must be viewed as having somehow qualified *Wheaton v. Peters'* rationale and its direct holding. I do not agree that *Callaghan* can be read in that manner. Nor do I agree with the majority's suggestion that the teaching of *Callaghan* "does not come through with unmistakable clarity." Slip op. at 8. For I believe *Callaghan's* teaching is clear when that case is read in tandem with *Banks v. Manchester*, 128 U.S. 244, 9 S.Ct. 36, 32 L.Ed. 425 (1888), as I believe it must.[44]

*Banks v. Manchester*, on its facts, involved a case in which the defendant published only the court opinions that had been earlier published by the plaintiff. *Callaghan*, on the other hand, on its facts was a case in which the defendant not only published the plaintiff's earlier-published court opinions, the defendant also copied that part of the plaintiff's law reports—the head notes and the statements of the cases prepared by the plaintiff—that *Wheaton v. Peters* recognized was subject to copyright.

---

**41.** Joyce noted the immediate impact of *Wheaton v. Peters* in regard to the publication of Johnson's *Chancery Reports Condensed* in 1836 in which the earlier published opinions of Chancellor Kent were "released from the state of confinement in which they are at present kept by means of the large sums asked for the volumes which contain them." *Id.* at 1386, n. 524.

*Wheaton v. Peters* produced the flood of litigation between law book publishers reflected by the "older cases" to which Professor Nimmer made reference by his citation of *Building Officials*, cited in 1 *Nimmer on Copyright*, § 5.06[C], p. 5–58, n. 30.

**42.** Henry Wade Rogers was Tappen Professor of Law at the University of Michigan School of Law in 1883. He later served on the law faculties of Northwestern and Yale Law School. He was appointed to the Court of Appeals for the Second Circuit in 1913, serving until his death in 1926. *See Judges of the United States* (Judicial Conference of the United States, 1983).

**43.** A few years later, in *Banks v. West Publishing Co.*, 27 Fed. 50 (C.C.Minn.1886), West successfully sustained its right to publish the opinions

of the Supreme Court of Iowa in its *Northwestern Reporter* in the face of an Iowa statute which purported to give a copyright to Banks. West's argument that "there is no such thing as a copyright or other property right in the opinions of the judges" was sustained, as it should have been. *Id.* at 56.

Circuit Judge Brewer relied on the lower court opinion in *Banks v. Manchester*, 23 Fed. 143 (1885), which in turn had relied on *Wheaton v. Peters* and on both of the lower court's opinions in *Myers v. Callaghan* reported in 5 Fed. 726 (1881) and 20 Fed. 441 (1883), which were also based on *Wheaton v. Peters*. The Supreme Court, of course, affirmed the lower court decisions on which Circuit Judge Brewer relied when it decided *Banks v. Manchester* and *Callaghan* in 1888.

**44.** *Banks v. Manchester* was decided on November 19, 1888, less than a month before *Callaghan* was decided on December 17, 1888. The opinions in both cases were written by Justice Blatchford.

The Court concluded in *Banks v. Manchester* that application of the principles enunciated in *Wheaton v. Peters* established that the defendant should prevail on the facts of that case. In *Callaghan*, the Court concluded that the application of the same principles of law supported a judgment that plaintiff was entitled to injunctive relief on the facts of that case.

The record in this case establishes a factual situation comparable to *Banks v. Manchester* rather than that presented in *Callaghan*. Hence, it is my view that our panel must follow *Banks v. Manchester*'s application of the principles enunciated in *Wheaton v. Peters* and distinguish *Callaghan* on its facts.

In *Banks v. Manchester* it is clear the defendant published *only* the opinions of the Supreme Court of Ohio together with the syllabus and the statement of case that had also been prepared by the judges.[45] In affirming the circuit court's dismissal of the plaintiff's infringement action, the Court concluded in *Banks v. Manchester* that:

> The question is one of public policy, and there has always been a judicial *consensus*, from the time of the decision in the case of *Wheaton v. Peters*, 8. Pet. 591 [, 33 U.S. 591], that no copyright could under the statutes passed by Congress, be secured in the products of the labor done by judicial officers in the discharge of their judicial duties. The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or a statute. *Id.* 128 U.S. at 253, 9 S.Ct. at 39.

The Court then quoted the final sentence of *Wheaton v. Peters* and added that "[w]hat a court, or a judge thereof, cannot confer on a reporter as the basis of a copyright in him, they cannot confer on any other person or on the State." *Id.* at 254, 9 S.Ct. at 40.

In *Callaghan*, the defendant had copied the plaintiff's head notes and statements of each case—the only part of a law report subject to copyright. The Court cited *Banks v. Manchester* to support its conclusion that "there can be no copyright in the opinions of the judges, or in the work done by them in their official capacity as judges." *Id.* 128 U.S. at 647, 9 S.Ct. at 184. It also concluded, consistent with *Wheaton v. Peters*, that there is "no ground of public policy" which prohibits a reporter from obtaining a copyright in that part of a law report "which will cover the matter which is the result of his intellectual labor." *Id.* at 647, 9 S.Ct. at 184.[46] *Callaghan*, in its application of the principles stated in both *Wheaton v. Peters* and in *Banks v. Manchester* expressly adopted the circuit court's findings of fact in regard to all volumes of Freeman's *Illinois Reports* in litigation.[47] *Callaghan* noted in regard to volumes 32 to 38, inclusive, that Judge

---

45. The Court stated that "it is to be taken as true, * * * that what the defendant published in 'The American Law Journal' was exclusively the work of the judges, comprising not only the opinion or decision of the court or the commission but also the statement of the case and the syllabus or head note." 128 U.S. at 251, 9 S.Ct. at 39.

46. *Callaghan* expressly adopted Justice Story's view of *Wheaton v. Peters* as expressed in *Gray v. Russell*, as reported in 1 Story, 11 (1839) (and reported as Case No. 5,728 in 10 Fed. Cases 1035). Justice Story stated in that case that it was "little doubted by the court [in *Wheaton v. Peters* ], that Mr. Wheaton had a copyright in his own marginal notes, and in the arguments of counsel as prepared and arranged in his work." *Id.* 128 U.S. at 650, 9 S.Ct. at 185.

47. The Court did so by quoting with approval the findings of fact made in Circuit Judge Drummond's first opinion in *Myers v. Callaghan* (which dealt with volumes 32 to 38 of plaintiff's Freeman's *Illinois Reports* ) as reported in 10 Bissell 139 (1881) and from his second opinion in *Myers v. Callaghan*, (which dealt with volumes 36 to 46 of the same reports) as reported in 20 Fed. 441 (C.C.N.D.Ill.1883). Judge Drummond's first opinion is also reported in 5 Fed. 726 (C.C.N.D.Ill.1881). Both Judge Drummond's opinions show that he relied solely on *Wheaton v. Peters* and that he made his findings of fact consistent with the principles stated in that case.

Drummond had stated in his first opinion that although there was an "appearance of independent labor performed" by defendant's editors, he found as a fact that it was apparent that "Mr. Freeman's volumes were used; in some instances words and sentences copied without change, in others, changed only in form; and the conclusion is irresistible, that for a large portion of the work [defendants] obtained that information from the volumes of Mr. Freeman." 128 U.S. at 660, 9 S.Ct. at 189.[48]

In regard to volumes 39 to 46, the Court quoted Judge Drummond's finding of fact made in his second opinion that: "Upon comparing parts of each of the volumes, * * * I think there can be no doubt that in some respects, in each case, the Freeman volume has been used by the defendants in the head-notes, the statements of facts, and the arguments of counsel." 128 U.S. at 661, 9 S.Ct. at 189.[49]

Judge Drummond observed in his second opinion in regard to volumes 39 to 46 that the "fact appears to be, and indeed it is not a subject of controversy, that in arranging the order of cases, and in the paging of the different volumes, the Freeman edition has been followed by the defendants." Id. at 661, 9 S.Ct. at 189. He, however, added in the same sentence, that "while this is so, I should not feel inclined, merely on that account and independent of other matters

to give a decree to the plaintiff, although it is claimed that the arrangement of the cases and the paging of the volumes are protected by a copyright." Id. (Emphasis added). The Court accepted Judge Drummond's conclusion that "the arrangement of law cases and the paging of the book may depend simply on the will of the printer, of the reporter, or publisher, or the order in which the cases have been decided, or upon other accidental circumstances." Id. at 662, 9 S.Ct. at 190.[50]

Callaghan, as I read that case, treated the plagiarized pages of the plaintiff's volumes solely as a question of fact and that it applied the principles enunciated in Wheaton v. Peters to all factual circumstances presented in that case. Those factual circumstances, as I have stated, were in sharp contrast to those presented in Banks v. Manchester, decided in tandem with Callaghan.[51]

Our panel must, of course, follow Callaghan. But our panel must also follow Wheaton v. Peters and Banks v. Manchester. Callaghan, as I read that case, simply applied the principles enunciated in Wheaton v. Peters to entirely different factual circumstances than those presented in either Wheaton v. Peters or in Banks v. Manchester.

---

**48.** Judge Drummond found, again as a matter of fact, that the defendant plagiarized plaintiff's head notes and statements of the cases in such a manner that "the paging of the [defendant's] volumes is substantially the same [as plaintiff's page numbers] so that the cases in the corresponding volumes appear on the same page." Id.

**49.** The Court apparently made its own examination of volumes 39 to 46. For it added its own finding that "one of the most significant evidences of infringement exists frequently in the defendants' volumes, namely, the copying of the errors made by Mr. Freeman." Id. 128 U.S. at 662, 9 S.Ct. at 190.

**50.** The Court also quoted Judge Drummond's finding that although the object of the defendant's plagiary of the plaintiff's page numbers was to avoid "confusion in the references and examination of the cases," he did not regard that fact "as an independent matter, but in connection with other similiarities existing between

the two editions, when I say, taking the whole together, the Freeman volumes have been used in editing and publishing the defendants' volumes." Id. at 662, 9 S.Ct. at 190.

**51.** It is not unlikely that the Court quoted Judge Drummond's discussion of the identical pagination of the volumes in response to a legal argument made by the defendant in Callaghan.

Defendant argued that "[t]he paging of the Freeman edition is equally wanting in any element of literary property, orginality or exclusive ownership. Ever since the invention of printing, books have been paged in numerical order, and appellee might with equal propriety claim an exclusive property in the system of Arabic numerals as in the paging of his books. Moreover, the printed paging is merely the mechanical labor of the printer, and is never performed by the author or publisher." 128 U.S. at 641, 9 S.Ct. at 183.

The principles of law stated and applied in all three of the Supreme Court cases are the same. I believe that an appropriate application of those principles requires that the district court's interlocutory order be reversed rather than affirmed.

For it is my view that if pagination of a law report had been at issue in any of those three cases, the Court would not have hesitated to hold that star pagination in a volume of published law reports would not be subject to copyright. That was the conclusion of the only court that has considered that precise issue.[52] I turn now to the Second Circuit's decision in *Banks*. For I agree with the majority's conclusion that "the treatment of case arrangement and pagination in *Callaghan* was not crucial to the Court's decision" in that case. op. At 1224.

### V.

I dissent from the majority's acceptance of the district court's conclusion that "*Banks* does not support MDC's claim."[53] At 1225. The Second Circuit concluded in *Banks* that the plaintiff's infringement action was properly dismissed.[54] The plaintiff claimed in *Banks* that the eleven volumes (Vols. 38 to 49) of defendant's "L.Ed." reports, which contained forty volumes (Vols. 156 to 171, 173 to 178, and 180–195, inclusive) of plaintiff's "U.S." reports, infringed its copyright on its "U.S." reports.[55]

The defendant, consistent with long-established practice in the publication of law reports, both in England and in the United States, used star pagination in order to permit jump citations to particular pages in plaintiff's "U.S." reports. It is thus clear, that on the facts in *Banks*, the purchase of defendant's "L.Ed." because of defendant's use of star pagination, completely eliminated the need to purchase any of plaintiff's "U.S." reports. Plaintiff in *Banks*, as had the plaintiff in *Wheaton v. Peters*, sought to enjoin all of defendant's law reports.[56]

Plaintiff, however, substantially amended its original complaint. Judge Hazel stated that by "stipulation of the parties the bill was amended to include *only* the charge of infringement arising out of *the arrangement of the cases,* the division into volumes, the table of cases, *and the numerical or star pagination* to indicate where in the official reports the different cases and points decided may be found." *Id.* at 386. (Emphasis added). *Banks* thus directly presented questions concerning the plaintiff's "arrangement of the cases" and the defendant's use of "star pagination."

Defendant broadly argued that "the reporter cannot have a copyright for *any* of the work produced by him in his official capacity" and further "broadly suggested that such labor is that of a paid employee and accordingly vests in the employer." *Id.* at 387–88. (Emphasis added). Judge Hazel rejected both those broad argu-

---

52. The Second Circuit has, of course, held that *the pagination of a publication of other material* that is in the public domain is not subject to copyright. *See* the discussion of *Eggers v. Sun Sales Corporation,* 263 Fed. 373 (2d Cir.1920), *infra,* at page 1247.

53. The district court stated that "[t]his Court finds that MDC, in relying upon *Banks,* has chosen a fragile bark upon which to sail the rocky shoals of copyright law" and that "*Banks* does not prohibit West Publishing Company from obtaining a copyright in the pagination * * * of its publications." 616 F.Supp. at 1577.

54. The Second Circuit held that "[w]e concur with Judge Hazel in his reasoning and conclusion that the *arrangement of reported cases in sequence, their paging and distribution into volumes,* are not features of such importance as to entitle the reporter to copyright protection of

such details." (Emphasis added). 169 Fed. at 391.

55. Defendant was able to include 40 volumes of the "U.S." reports in only 11 volumes of its "L.Ed." reports because the defendant's reports were printed in substantially smaller type and the arguments of counsel were omitted. The syllabuses and other editorial matters in the defendant's volumes were also more precise and *substantially shorter than those published in* plaintiff's volumes.

56. Judge Hazel noted that plaintiff's "original bill charged the defendant with reproducing the syllabuses of the cases, table of cases, index digest, *together with the pagination and order of arrangement* of printing the decisions copyrighted by complainant and its predecessors." (Emphasis added). *Id.* at 386.

ments. He recognized that the right to copyright the work of a paid employee, generally speaking, did vest in his employer. He concluded, however, that under *Banks v. Manchester* the "official reporter of the Supreme Court, though a sworn public officer, is not, however, confined to this strict rule." *Id.* at 388.[57]

Citing *Banks v. Manchester*, Judge Hazel held that "[n]either the court nor the reporter *from motives of public policy*, can have any exclusive rights in the written or oral opinions of the court." *Id.* at 388. (Emphasis added). Judge Hazel concluded, and the Second Circuit concurred, that "the reporter's right to protection must be limited to his intellectual labor" and that "for another to simply adopt the plan of grouping of the cases, making marginal reference to the paging of the volumes issued under his direction, without in any way pirating the substance of his origination, is not enough, in my judgment, to establish infringement." *Id.* at 390.

Judge Hazel expressly relied on Justice Harlan's opinion written as a Circuit Justice in *Howell v. Miller*, 91 Fed. 129, 33 C.C.A. 407 (1898). He quoted with approval Justice Harlan's statement that "[i]f Miller had cut from Howell's books, delivered to him by the state, the General Laws of Michigan as therein printed, and the pages so cut out had been used when his compilation was printed—if this had been done and nothing more—there would have been no ground of complaint." Judge Hazel then concluded that "an action for infringement does not lie if the defendant's asserted wrongdoing simply consisted of reprinting the decisions of the court *with the paging*, the defendant independently supplying headnotes, statements of cases, etc."[58] *Id.* at 391. (Emphasis added).

It is important to note that *Banks* considered the factual circumstances relating to that plaintiff's arrangement of cases. In regard to both the plaintiff's arrangement of the cases and its pagination of the volumes, Judge Hazel concluded that for a reporter "to merely arrange the cases *in sequence* [and to page] the volumes [were not] features or characteristics of such importance as to entitle him to copyright protection of such details." 169 Fed. at 390. (Emphasis added). That conclusion, when read with Judge Hazel's discussion of all three of the controlling Supreme Court cases, was obviously based on the reason that such an arrangement and the pagination of the volumes were not original works of authorship within the meaning of the Copyright Act.[59]

Attention should therefore be focused on whether the opinions reported in the volumes of the "U.S." reports in litigation had, in fact, been merely arranged "in sequence." For I do not believe that it can be doubted that all the volumes in litigation were in the record considered by the district court and Second Circuit in *Banks*.

---

**57.** Judge Hazel explained that "[t]here is abundant precedent for holding that a salaried reporter of the court, unless forbidden by statute, may secure copyright of the headnotes, statements of cases, title of the volume, arrangement or grouping of cases, index digest, synopsis of the arguments, and in short such portions of his compilation or authorship as requires the exercise of intellectual thought and skill," citing *Banks v. Manchester*, 128 U.S. 244, 9 S.Ct. 36, 32 L.Ed. 425. *Id.* at 388.

Judge Hazel added that it "had been held in the federal courts previous to the date of that decision [*Callaghan* ] that an official court reporter is entitled to copyright protection for his marginal notes or synopsis of case, statement of cases, abstract of arguments of counsel, and indexes to volumes. *See Wheaton v. Peters*, 8 Pet. 591, 8 L.Ed. 1055; *Gray v. Russell*, 1 Story, 11 Fed.Cas. No. 5,728." *Id.* at 388.

**58.** It is to be noted that Justice Harlan was a member of the Court that decided *Banks v. Manchester* and *Callaghan*. He summarized what each case held in his opinion in *Howell v. Miller*. Justice Harlan did not suggest that the official status of the reporter was a factor that played a part in either decision.

The passage of time has not eroded the precedent of *Howell v. Miller*. For Justice Harlan's statement was recently quoted with approval in *State of Georgia v. Harrison Co.*, 548 F.Supp. 110, 114 (N.D.Ga.1982), *vacated per stipulation*, 559 F.Supp. 37 (1983).

**59.** The Second Circuit expressly concurred in Judge Hazel's "reasoning and conclusion that the arrangement of reported cases *in sequence*, their paging, and distribution into volumes, are not features of such importance as to entitle the reporter to copy-right protection of such details." *Id.* at 391.

Examination of each "U.S." volume in litigation establishes that the Court's official reporter, Bancroft Davis (whose testimony was quoted in Judge Hazel's opinion) meant exactly what he said when he testified that he simply took the cases "as they came." *Id.* at 389.[60] Examination of those "U.S." volumes establishes that the cases were, in fact, published *in the sequence* in which they had been decided.

The record in this case shows that the district court asked West's counsel whether it was West's theory that "the *page numbers* express the arrangement" of West's cases. (A301). West's counsel replied that "they certainly do, your Honor." (*Id.*). West's counsel directed the district court's attention to 300 F.Supp. 100 to illustrate West's arrangement. (A203).

MDC attached an addendum to its brief (A32a—A38a) that compared how the cases would have been arranged in 300 F.Supp. had the cases been arranged by date of decision with the actual arrangement of the cases as they were, in fact, reported in 300 F.Supp. That addendum shows that West's actual arrangement of cases was inconsistent with the method stated in West's affidavits. West, in its brief filed in this Court, replied to MDC's argument by stating that its affidavits set forth only West's "current practice" and stated that 300 F.Supp. "was published in 1969 before [West's] current practice was adopted." (West's brief, p. 15, n. 11).

West's answer to MDC's argument raises two factual questions, neither of which were considered by the district court or by the majority. First, if the West affidavits cover only the manner in which West has arranged its cases since 1969, there is nothing in the record to support any finding of fact in regard to how West may have arranged its cases in all the volumes of reports published by it from January 2, 1910 to 1969.[61] Second, and perhaps of greater importance, if West simply publishes cases in the chronological *sequence* that cases are handed down by a particular court, such an arrangement would fall within the factual circumstances and decision in *Banks.*

I disagree with the majority's suggestion, at 1225–1226, that time has somehow eroded *Banks'* application of the principles of law that were settled by *Wheaton v. Peters.* The Second Circuit followed *Banks* in *Eggers v. Sun Sales Corporation, supra,* 263 Fed. 373. That case rejected a plaintiff's argument which was substantially the same as West's *Callaghan* argument in this case. The question presented was whether the defendants' use of the same pagination used by the plaintiff in its copy-righted publication of General Pershing's World War I Official Report to the Secretary of War, a document in the public domain, could be said to infringe plaintiff's copyright. A panel of the Second Circuit that included Henry Wade Rogers (*see* footnote 42, *supra*) affirmed the district court's dismissal of plaintiff's infringement action.

On the facts of that case, defendants did not reproduce any of the drawings, photographs or any other feature of plaintiff's pamphlet that were admittedly subject to copyright. Defendants did, however, use plaintiff's page numbers in its publication after learning that "there was a good market for the report"; there was no question

**60.** Both Judge Hazel and the Second Circuit obviously refused to accept portions of Mr. Davis' quoted testimony which might be said to suggest the cases were arranged in some other manner.

**61.** I have additional doubts about the record before the district court. For one of West's affidavits stated that "West does not give any judge the opportunity to approve West's corrections prior to publication." (A 51). While that statement may be accurate in regard to West's current practice, judges appointed before 1969 will recall West's pre–1969 practice of sending the galley proof of an opinion designated for publication back to the judge who wrote the opinion for corrections prior to publication.

The record, as I read it, does not reflect, either the pre–1969 practice or the reasons for West's apparent abandonment of that practice. Those factual circumstances may, in my view, be relevant to the determination of the factual questions presented on the merits in regard to how West has "arranged" its cases both before and after 1969. For the permanent injunctive relief sought by West covers both periods of time.

that the defendants did, in fact, imitate "plaintiff's attractive get-up." *Id.* The *Sun Sales* court recognized that defendants' conduct "may be called mean" and that, on the facts, it was "even possible that defendants' printers set up the official report from a copy of plaintiff's book; identity of pagination leads to that suspicion." 263 Fed. at 375.

The court, however, in express reliance on its earlier decision in *Banks*, stated in that regard that "legally that is not of sufficient importance to constitute infringement of copyright." *Id.* at 375. The court concluded that "[a]ssuming, * * * that plaintiff's pamphlet contains any copyrightable matter, we are of the opinion * * * that defendants' is not an infringement." *Id.* at 375.

It is thus clear that the Second Circuit's decision in *Banks* does not stand alone. I suspect the reason that there are but few cases that involve questions of whether the pagination of a document in the public domain is subject to copyright is because few plaintiffs have ever tried to make such a claim in regard to the page numbers on their copyrighted publication.[62] But whatever the reason, such a claim has been rejected by every court that has had occasion to decide the question.

West has cited no authority to support its contention that it is entitled to copyright protection of either its arrangement of cases or the pagination of all the volumes it has published since January 2, 1910 under either its past or its current practice. I believe that this court, particularly on a Section 1292(a)(1) appeal, should hesitate to suggest that the scope of the copyright act can be said to protect West's arrangement of cases which may, on the facts, be no more than the sequential publication of court opinions in the chronological order in which the cases are handed down. Nor do I believe on the record in this case that we should suggest in any way that the scope of West's copyright is broad enough to protect the placement of arabic numbers on

the pages of the volumes in which those opinions are published.

As I suggested at the outset, I would follow the lead of the First Circuit in *Building Officials & Code Adm., supra,* and reverse the district court's grant of a preliminary injunction on this Section 1292(a)(1) appeal. For I believe, as did the First Circuit, that final judgment in this case should await a more complete hearing on the merits in the district court and a later review of that court's final decision on a Section 1291 appeal.

I concur in part and respectfully dissent in part for the reasons stated.

---

62. *See* the discussion of the page numbers on a new compilation of Shakespeare's work, *supra,* at page 1235 n. 18.