**OASIS PUBLISHING COMPANY,
INC., Plaintiff,**

v.

**WEST PUBLISHING COMPANY,
Defendant.**

Civil No. 3–95–563.

United States District Court,
D. Minnesota,
Third Division.

May 17, 1996.

Bruce Howard Little, Janell M. Gabor, Popham Haik Schnobrich & Kaufman, Minneapolis, MN, Jose I. Rojas, Broad & Cassel, Miami, FL, for Oasis Publishing Company, Inc.

Joseph Myles Musilek, Monica M. McCarty, Schatz Paquin Lockridge Grindal & Holstein, Minneapolis, MN, for West Publishing Company.

## MEMORANDUM AND ORDER

MAGNUSON, Chief Judge.

This matter is before the Court upon West Publishing Company's (West's) Motion for Partial Summary Judgment and on Oasis Publishing Company, Inc.'s (Oasis') Cross-Motion for Partial Summary Judgment. For the following reasons the Court grants West's motion and denies Oasis' motion.

## BACKGROUND

Oasis Publishing Company, Inc., (Oasis) publishes the statutes and cases of several states in Compact Disc Read Only Memory (CD–ROM) format. Among other works, West Publishing Company (West) publishes case reports of both state and federal courts in print in the National Reporter System, in its on-line computer database service (WESTLAW) and also in CD–ROM format. Both parties are private, for-profit corporations.

West publishes the *Southern Reporter*, a regional reporter that includes state court appellate decisions from Alabama, Florida, Louisiana and Mississippi. The *Southern Reporter* is a part of West's National Reporter System. West also publishes *Florida Cases*, in which it reprints Florida decisions as they appear in the *Southern Reporter* with related preliminary tables and digest material. This material includes case synopsis, syllabi, digest key numbers, index digests, and tables of statutes. The parties agree that West has a copyright in *this* material and it is not the subject of this dispute. Instead of having its own pagination, the *Florida Cases* reporter is printed using the volume numbers and pagination of the *Southern Reporter*. As a result, pagination in *Florida Cases* is not consecutive, but has numeric gaps where Alabama, Louisiana and Mississippi cases would appear in the *Southern Reporter*. In other words, the *Florida Cases* reporter is essentially the *Southern Reporter* with non-Florida cases omitted. Thus, when citing to *Florida Cases* one actually cites to the *Southern Reporter*.[1]

The history of the *Florida Cases* and the *Southern Reporter* bears on this case. West began publishing the *Southern Reporter* in 1887 as part of its National Reporter System, including decisions of Florida courts. Prior to 1948, the State of Florida privately published and sold the decisions of Florida courts in its *Florida Reports*. In 1948, the same year Florida ceased publishing the *Florida Reports* as the official reporter of its appellate decisions, the Florida Supreme Court issued a notice declaring the *Southern Reporter* the "official publication of the opinions and decisions of the Supreme Court of Florida." The following year West began publishing *Florida Cases*. In 1972 West extended coverage of *Florida Cases* back to 1941, the year the *Southern Reporter* began its second series. Therefore, coverage of the *Florida Cases* now corresponds to Volume 1 of *Southern Reporter*, Second Series.

Florida Statute 25.381, enacted in 1963, provides, "The reports of the opinions of the Supreme Court and the district courts of

---

1. A copy of a title page from a 1993 *Florida Cases* volume reads as follows: "West's Florida Cases; Cases Adjudicated in the Supreme Court and District Courts of Appeal of Florida, Reported in Southern Reporter, Second Series, A Unit of the National Reporter System; 603 So.2d." The copyright notice on the following page states, "Reprinted from Southern Reporter, Second Series, Volume 603; Copyright 1992 by West Publishing Co., St. Paul, Minnesota; All rights reserved."

appeal shall be known as *Florida Cases*." The Bluebook of citation provides that in documents submitted in Florida state courts, one should cite to *Florida Reports* for the years 1846–1948 and to *Southern Reporter* from 1886 to the present. The Bluebook, a Uniform System of Citation 178 (15th ed. 1991). The Bluebook does not direct citation to, or even mention, the *Florida Cases*.

The State of Florida recognizes *Florida Cases* as Florida's official reporter. From at least 1957 to 1987, the contracts between Florida and West have stated in part, "The Synopsis, Syllabi, and Key Number Digest classifications, Index Digest, Table of Statutes Construed ... included in the volumes of *Florida Cases*, are subject to copyright and will be copyrighted." Beginning in 1987, the parties added "and arrangement of cases" to this sentence.

Before 1982, *Florida Cases* was published only in bound volume format. From 1982 through the present, *Florida Cases* has been published in weekly advance sheets. Several advance sheets combine to form a bound volume. The *Southern Reporter* also is published first in weekly advance sheets, then in bound volumes. Each advance sheet and bound volume of *Florida Cases* and *Southern Reporter* contains a copyright notice. West holds Certificates of Registration of Copyright for each volume of the *Southern Reporter*, but does not obtain separate copyright registrations for bound volumes of *Florida Cases*. So before 1982, West did not obtain a copyright registration for either advance sheets or bound volumes of *Florida Cases*. West's Certificates of Registration do not identify "page numbers" as the subject of the claim of copyright.

"Parallel citation" in a published case is the citation to the first page of another publisher's version of the same case. "Star pagination" is a feature whereby a published case includes not only the parallel citation, but also throughout the case includes the internal page breaks from another publisher's version of the case.

Oasis has announced its intent to publish reports of Florida court decisions on CD–ROM, having both parallel citation and star pagination to *Florida Cases*. Pagination to *Florida Cases*, of course, is pagination to the *Southern Reporter*, since pagination in the *Florida Cases* intentionally mirrors the pagination of the *Southern Reporter*. Oasis intends to obtain a set of *Florida Cases* in bound form and send the volumes to a service in order to translate the Florida decisions into computer data, ultimately to convert the decisions into CD–ROM format and market the CD–ROM product. Oasis does not intend to include the digest material (case synopsis, syllabi, etc.) authored by West. While West concedes that use of parallel citation is a fair use under the Copyright Act, it objects to Oasis' planned use of star pagination to *Florida Cases/Southern Reporter*.

Oasis sued West in the Southern District of Florida. In its Complaint, Oasis alleged: in Count I that West created and maintains an illegal monopoly in violation of 15 U.S.C. § 2; in Count II that West has created a dangerous probability of monopolization in violation of 15 U.S.C. § 2; in Count III that West's alleged monopoly also violates Florida Statute § 542.19; in Count IV that West attempts to create a monopoly under Florida Statute § 542.22; in Count V that West's refusal to permit Oasis to star paginate violates various Florida public records statutes; and in Count VI that the Court should issue a declaratory judgment that West has no federal copyright protection to page numbers in the *Southern Reporter*, that Oasis does not infringe any copyright in West by referring to the page numbers, and that Florida public records law makes unenforceable any copyright in the page numbers in the *Southern Reporter*.

West moved to dismiss all counts and later to transfer to this Court. Without providing its analysis, the Southern District of Florida transferred the case here, and did not rule on West's motion to dismiss. Once here, after further discovery, West now moves for partial summary judgment as to Counts V and VI. Oasis cross-moves for partial summary judgment, seeking a declaratory judgment that West has no copyright in the arrangement of the decisions in the *Florida Cases*, or that the proposed star pagination by Oasis is a "fair use", and that West has violated Flori-

da Statutes chapter 119. The parties have agreed to defer consideration of the merits of the federal and Florida antitrust claims pending disposition of the copyright claims at issue here.

## DISCUSSION

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219–20 (8th Cir.1992). The court determines materiality from the substantive law governing the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *Id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49, 106 S.Ct. at 2510–11.

This dispute poses several issues: Does West have a copyrightable interest in the arrangement of the decisions in the *Southern Reporter* and *Florida Cases?* If so, does Oasis' proposed star pagination infringe the copyrightable elements of West's arrangement? Or, is the star pagination a "fair use" of West's copyrights? Finally, does the "official" designation of *Florida Cases* or the *Southern Reporter*, or Florida Public Records Act render West's purported copyright unenforceable?

## I. Copyright in Arrangement of Cases

Oasis argues that West has no copyright protection in the arrangement of the *Southern Reporter;* that even if it did, West's copyright does not protect the internal pagination of the cases reported in the *Southern Reporter;* and finally, that no such copyright protection reaches the internal pagination of the *Florida Cases.* West does not argue it has a copyrightable interest in the internal page numbers *per se,* but asserts it has a copyright interest in the arrangement of cases in the reporters.

As a preliminary matter, Oasis recognizes that a compilation may be entitled to copyright protection, but argues, despite West's contention, that the real issue is whether West can have a copyright simply in pagination. Oasis maintains that pagination does not represent any arrangement, but is instead a mere system or process not subject to copyright protection. 17 U.S.C. § 102(b). The Court disagrees. As was the case in *West Publishing Co. v. Mead Data Central, Inc.*, "protection for the numbers is not sought for their own sake." 799 F.2d 1219, 1227 (8th Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). As it did in *Mead,* West argues that the internal pagination expresses its arrangement of cases, and that the protection West has in the arrangement of cases extends to pagination.

To qualify as a copyrightable compilation, a work must embody three distinct elements: "(1) the collection and assembly of pre-existing material, facts, or data; (2) the selection, coordination, or arrangement of those materials; and (3) the creation, by virtue of the particular selection, coordination, or arrangement of an 'original' work of authorship." *Feist Publications v. Rural Telephone Service Company,* 499 U.S. 340, 357, 111 S.Ct. 1282, 1293, 113 L.Ed.2d 358 (1991). The dispute today focuses on the third element—originality—which is present here if West's arrangement of the cases "possesses more than a *de minimis* quantum of creativity." *Id.* at 363, 111 S.Ct. at 1297.

The mainstay of Oasis' primary argument is that *Feist* has implicitly overruled *Mead.* In *Mead,* the Eighth Circuit affirmed this Court's (Rosenbaum, J.) decision to grant West a temporary injunction prohibiting Mead from using West's internal citations in Mead's proposed LEXIS star pagination computer research product. The *Mead* court found internal pagination part of West's arrangement, and found West's arrangement copyrightable. 799 F.2d at 1226–29. Finally, the court held that on the facts before it, LEXIS' proposed use would violate West's copyrightable arrangement. In *Feist,* the Supreme Court considered whether a publisher could duplicate selected listings from

white pages that had been published by the local telephone company.. It held that neither the information copied from the original white pages nor their selection and arrangement were copyrightable, and therefore the Court found no infringement by the duplication. 499 U.S. at 362–64, 111 S.Ct. at 1296–97.

Oasis insists that *Mead* applied a "sweat-of-the-brow" standard, which *Feist* rejected. In *Feist*, Justice O'Conner clarified that "[t]he *sine qua non* of copyright is originality." 499 U.S. at 345, 111 S.Ct. at 1287. The opinion reiterates that while choices concerning selection and arrangement are eligible for copyright protection if they are sufficiently original, the underlying compiled facts themselves do not become original or copyrightable merely through association with the selection or arrangement. *Id.* at 348–49, 111 S.Ct. at 1289–90.

In *Mead*, the Eighth Circuit applied essentially the same creativity standard discussed and applied in *Feist*. Instead of a mere "sweat-of-the-brow" analysis of West's arrangement of cases in the National Reporter System, the court considered the "originality and intellectual-creation requirements" of the arrangement. *Mead*, 799 F.2d at 1225–26. *Feist* did not overrule *Mead*.

*Feist* did not purport to establish a new test for claimed copyrights in compilations, but expressly reaffirmed the originality standard as it existed in the Copyright Act of 1909, as it was consistently recognized by the Copyright Office, and as it was emphasized by the Copyright Act of 1976. *See* 499 U.S. at 351–56, 111 S.Ct. at 1290–93. Even assuming that the creativity standard articulated in *Feist* provided a "new" substantive test not predicted and expressly applied by *Mead*, the test as applied to the selection and arrangement in *Feist* yet does not cast doubt upon *Mead*. At issue in *Feist* was the telephone company's mere publishing of the name, town and telephone number of every person who applied to the telephone company for telephone service. This was at most "'selection' of a sort," but was "basic" and "obvious," and lacked even "the modicum of creativity necessary to transform mere selection into copyrightable selection." *Id.* at 362,

111 S.Ct. at 1296. And the arrangement was the nothing more than the listing of the information into simple alphabetical order, and so it, too, failed to meet the creativity threshold. *Id.* at 363, 111 S.Ct. at 1296–97 ("[T]here is nothing remotely creative about arranging names alphabetically in a white pages directory.").

It is a mistake, however, to conclude that the Supreme Court in *Feist* sought to elevate the originality standard. The Court expressly and frequently reaffirmed that though a compilation must possess a degree of originality, the creativity standard necessary to trigger copyright protection is quite low. *Feist* teaches that "original" means "only that the work was independently created ... and that it possess at least some minimal degree of creativity"; that "the requisite level of creativity is extremely low"; that "even a slight amount [of creativity] will suffice"; that the "vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious'"; that arrangements are sufficiently original so long as they are independently made and "entail a minimal degree of creativity"; that "the originality requirement is not particularly stringent"; that "novelty is not required"; that the "creative spark [will be found] utterly lacking or so trivial as to be nonexistent" only in a "narrow category of works"; that a selection and arrangement will fail only if it is "so mechanical or routine as to require no creativity whatsoever." 499 U.S. at 345–62, 111 S.Ct. at 1287–96 (citations omitted). On the basis that copyright protects only works possessing "more than a *de minimis* quantum of creativity," *id.* at 363, 111 S.Ct. at 1297, the Court found the selection, coordination and arrangement of the telephone company's white pages "devoid of even the slightest trace of creativity." *Id.* at 362, 111 S.Ct. at 1296.

The *Mead* court held West's arrangement of cases in its National Reporter System met the "intellectual-creation requirements" to satisfy a copyright in the arrangement. In so holding, the court noted that West first collects opinions from every state and all federal courts, separates state decisions from federal decisions, assigns the decisions for

placement in various regional reporters, divides decisions by level of court, separates the decisions of the Court of Claims and military courts, divides decisions based on topics, and arranges cases within each volume. 799 F.2d at 1226. Contrary to Oasis' assertion, the Eighth Circuit's discussion obviously regarded the intellectually creative efforts of West, not merely the thoughtless labor of assembling and publishing the cases in some unoriginal manner, such as by mere chronology or by court. This Court concludes that the *Mead* court applied the proper originality standard, but that even if it had not, its analysis demonstrates that West's arrangement in that case easily satisfied the "modicum of creativity" later emphasized repeatedly by the Supreme Court in *Feist.*

■ Turning to the present case, West's method of arrangement for the *Southern Reporter* is undisputed. Indeed, perhaps due to the preliminary procedural setting of *Mead,* there are more facts on the record now before the Court than were discussed in *Mead* establishing creativity in the arrangement of cases. First, West divides the cases by state, separating Alabama, Florida, Louisiana and Mississippi court decisions. Next, West divides the decisions by court level. For example, it separates the decisions of the Alabama Supreme Court, Alabama Court of Civil Appeals, and Alabama Court of Criminal Appeals. Within each state and court level, West divides the decisions and arranges them by placing first the fully headnoted opinions and jacketed memoranda, next sheet memoranda, and finally table dispositions. It arranges the table dispositions alphabetically and the fully headnoted opinions and jacketed memoranda by file date, but if issued on the same date, by the case number assigned by West. Certain attorneys at West serve as editors. These editors not only make decisions concerning which

cases to headnote, but whether to override West's general guidelines for arrangement based on the subject matter of the decisions. Accordingly, in nearly twenty-five percent of the cases a West editor will override West's general guidelines for arrangement and arrange cases differently. For example, the West editor might choose to process a case more quickly where the case otherwise would be destined for a later volume, so that the case instead will follow a related decision in the same volume.[2] Similarly, West may decide to speed its process and publish a decision immediately after a related decision, disregarding the date the decisions were rendered.[3] Or West might choose to combine separate decisions into a single published opinion.[4]

West's arrangement is followed by no other publisher, requires far more than rote chronological or jurisdictional sequencing, and for the additional reasons discussed above, possesses "more than a *de minimis* quantum of creativity." United States appellate decisions since *Feist* support this conclusion. *Compare CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61 (2d Cir.1994) (holding published compilation of automobile valuations sufficiently original where the compiler used various sources to predict the values of used cars), *cert. denied,* —— U.S. ——, 116 S.Ct. 72, 133 L.Ed.2d 32 (1995); *and Key Publications v. Chinatown Today Publishing Enterprises, Inc.,* 945 F.2d 509 (2d Cir.1991) (holding a Chinese business directory's selection was sufficiently creative where publisher selected businesses associated with New York's Chinese–American community from all businesses but excluded businesses she believed would not remain in operation; and also finding sufficient creativity in arrangement, although the format was common to most classified directories, where the publisher had

**2.** West provides *State v. Campbell,* 661 So.2d 1321 (La.1995), and *State v. Campbell,* 661 So.2d 1374 (La.1995), by way of example.

**3.** West provides *Elliott v. Elliott,* 648 So.2d 135 (Fla.Dist.Ct.App.1994), and *Elliott v. Elliott,* 648 So.2d 137 (Fla.Dist.Ct.App.1994), as an example. The Florida District Court of Appeals decided the former on March 23, 1994 and the latter on November 30, 1994, yet the cases are published

one following the other in the Southern Reporter.

**4.** West provides *Times Publishing v. Ake,* 645 So.2d 1003 (Fla.Dist.Ct.App.1994) by way of example, in which it combined two decisions, one made on June 29, 1994, and the other on September 23, 1994. By contrast, LEXIS reported the decisions separately.

chosen which categories to include and under what heading); *with BellSouth Advertising & Pub. Corp. v. Donnelley Information Pub., Inc.,* 999 F.2d 1436 (11th Cir.1993) (holding that telephone directory lacked requisite originality in selection where the publisher simply determined the geographic scope of its directory and the date after which it would permit no changes in the listings) (*en banc* ), *cert. denied,* —— U.S. ——, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994).

Certainly "[m]ost applications of *Feist* have recognized the circumscribed sphere to which its holding applies, ruling that it invalidates the copyright only in the most banal of works, such as the white pages of a phone book." 1 M. Nimmer, Copyright § 3.04[B][2], p. 3–33 (footnotes omitted). West's arrangement regimen of the *Southern Reporter* easily satisfies the originality requirement set forth in *Feist* to justify copyright protection.

■ The Court turns to Oasis' argument that West's copyright in the arrangement of cases does not protect the internal pagination of the cases reported in the *Southern Reporter.* Oasis points to the fact that West concedes parallel citation to *Southern Reporter* cases is a noninfringing fair use, and argues that the subsequent internal pagination of each case is completely lacking in creativity—a mere system or process beyond copyright protection. Once West has chosen its case arrangement, arguably *all* of the corresponding page numbers are part of a system or a mere uncopyrightable process which simply identifies the pages on which the text happens to fall. But this is the precise argument necessarily rejected in *Mead.* As the Eighth Circuit determined on the facts before it in *Mead,* "West's case arrangements, *an important part of which is internal page citations,* are original works of authorship entitled to copyright protection." 799 F.2d at 1227 (emphasis added). Likewise here, the internal pagination of the *Southern Reporter* is part of West's overall arrangement, and similarly protected.

■ Finally, Oasis argues that copyright protection in the *Southern Reporter* arrangement does not create copyright protection in the internal pagination of the *Florida Cases.*

However, as noted, one does not actually cite to the *Florida Cases* but to the *Southern Reporter;* the *Florida Cases* is essentially a mere duplication of the *Southern Reporter*—including page numbers—minus only the non-Florida cases. Moreover, the choices involved in selecting the order of Florida appellate decisions in the *Florida Cases* alone satisfy the creativity standard discussed above. Oasis recognizes that within each level of the Florida courts, West must arrange the decisions by headnoted opinions, memoranda decisions, or table dispositions, and West editors make the same creative decisions concerning overriding West's general arrangement guidelines. Furthermore, Oasis does not dispute that the Florida decisions in *Florida Cases* constitutes a about sixty percent of the *Southern Reporter.*

In sum, West's arrangement of cases in the *Southern Reporter* possesses the requisite creativity for copyright protection. Pagination of that arrangement is an integral part of the arrangement and shares in any copyright protection in the arrangement itself. That *Florida Cases* omits all but decisions of Florida courts does not reduce the creativity that went into the original arrangement of the *Southern Reporter,* and the creativity applied in arranging the Florida appellate decisions alone demonstrates the creativity necessary for copyright protection in the arrangement duplicated in the *Florida Cases.* As in *Mead,* West's arrangement of cases here, including internal pagination, is an original work of authorship entitled to copyright protection. As established by the Supreme Court over a century ago, "[s]uch work of the reporter, which may be the lawful subject of copyright, comprehends also the order of arrangement of the cases, the division of the reports into volumes, *the numbering and paging of the volumes,* the table of the cases cited in the opinions, … and the subdivision of the index into appropriate, condensed titles…." *Callaghan v. Myers,* 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547 (1888) (emphasis added).

## II. Infringement by Star Pagination

Generally, only the owner of a copyrighted work may reproduce the work. 17 U.S.C.

§ 106(2). The Copyright Act protects works from being copied, such as literary works, 17 U.S.C. § 102(a)(1), and "[t]he term 'literary works' ... includes catalogs directories, and similar factual, reference or instructional works and compilations of data." H.R.Rep. No. 1476, 94th Cong., 2d Sess., (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5667.

■ Oasis argues that its star pagination would not infringe any copyright West has in the arrangement of cases. It asserts that West's copyright in the arrangement of cases does not protect the internal pagination of the cases reported in the *Southern Reporter*. Oasis points out that West concedes parallel citation to the first page of *Southern Reporter* cases is a fair use. Thus, argues Oasis, because West effectively reveals the arrangement already by permitting publishing of citation to the first page, the internal paging reveals nothing more of the arrangement and so becomes fair prey for publication. The Court disagrees.

Just as it has here, in *Mead* West had also conceded that parallel citation to the first page of reported cases was a noninfringing fair use. 799 F.2d at 1222. In that case, the use of "jump citing" in LEXIS based on West's internal page numbering could reveal to the user West's arrangement, and this was held an impermissible infringement of West's copyright in the arrangement of cases. Likewise here, by determining an internal page from each case in a given volume, the user could sort and determine West's arrangement with Oasis' CD–ROM product, without regard to the parallel citation. That West has conceded the first page as a fair use does not authorize another publisher to copy *every* page citation. Although with either the parallel cites *or* an internal cite from each case a user could sort West's cases and determine West's arrangement, the former does not utterly supplant the need for West's product while the latter does.

Conceding parallel citation to the first page of each case as a noninfringing fair use does not diminish West's copyright interest in the subsequent internal pages, which also would *independently* permit arrangement of the cases by sorting. Having gotten the inch under the conceded fair use of parallel citation to the first page of each case, Oasis is not thereby entitled to take the entire mile in star citation to *every* page. So despite that Oasis' proposed CD–ROM product *could* be used to recreate West's arrangement even without the internal cites by sorting the cases from the information available as a fair use, Oasis' copying and provision to CD–ROM users of the complete internal pagination of the cases through star citation is nevertheless an infringement of West's copyrighted interest in its arrangement of cases.

### III. Star Pagination as "Fair Use"

■ A reproduction is not an unlawful infringement if the reproduction is a "fair use," such as a reproduction for criticism, comment, news reporting, teaching, scholarship, or research. To determine whether Oasis' proposed copying of West's internal pagination is a fair use, the Court will consider (1) the purpose and character of the use, including whether the use is commercial or instead for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the work as a whole; and (4) the effect of the use on the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

#### 1. Purpose of the Use

As to the first factor, Oasis argues the CD–ROM product will be primarily for education, scholarship and research. Indeed it may. But it may be fairly argued in nearly every case of copyright infringement of literary or factual arrangements that the new use will be educational or to assist in research. This factor also requires separately weighing whether the educational use will be commercial or nonprofit. While Oasis' product may be used for education or research, the product is to be for *profit* educational use, not *nonprofit* educational use. Incontrovertibly, Oasis' intended use is commercial. In fact, it admits that it intends to undercut West's price and compete with West. "The fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use." *Harper*

*& Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985).

In *Nation,* the Supreme Court considered the use by The Nation Magazine of portions from an unpublished manuscript of former President Gerald R. Ford's autobiography. The publishers of the autobiography had entered an agreement with Time Magazine authorizing Time to publish certain portions of the manuscript on the eve of the book's release. But the Nation obtained a copy of the manuscript, became aware of Time's pending article, and hastily published quotes, paraphrases, and facts drawn exclusively from the manuscript with the express purpose of "scooping" both Time and the book. Although the Court recognized news reporting as the general purpose of The Nation's use in publishing the manuscript, the Court "[could] not ignore The Nation's stated purpose of scooping the forthcoming hardcover and Time abstracts." 471 U.S. at 562, 105 S.Ct. at 2231. It therefore found that "The Nation's use had not merely the incidental effect but the *intended purpose* of supplanting the copyright holder's commercially valuable right of first publication." *Id.* (emphasis in original). In so finding, the Court cited with approval *Meredith Corp. v. Harper & Row, Publishers, Inc.,* 378 F.Supp. 686, 690 (S.D.N.Y.), *aff'd,* 500 F.2d 1221 (2d Cir.1974), where the purpose of the challenged textbook was to compete with the very text from which selections were taken, and where the district court held the use was not a fair use.

Oasis' argument that its use is "transformative" and not merely a replacement of West's product is flatly contradicted by its own 1994 Summary Business Plan. The Plan also demonstrates the directly competitive nature of its proposed CD–ROM product with West products. It states in part:

West Publishing Company and Lawyer's Cooperative are the prime competitors of Oasis. Each company produces a similar product with the difference being price.... These companies are not in business to sell CD–ROMs; they are in the business to sell books and on-line services. Their CD–ROM sales take away from their book and on line services. Therefore, they

have placed a premium price on their CD product.

Using the Oasis CD–ROM, customers will realize significant paper savings. Note taking can be done on the screen and obvious paper savings result from purchasing one compact disc versus shelves and shelves of hard bound books.

Additionally, Oasis Florida Distributor Gioavanni D'Azzo admitted during his deposition that the Oasis CD–ROM product would compete directly with West's Florida CD–ROM product and for some customers could serve to completely replace the printed volumes. Oasis Secretary Richard Qualsett made a similar admission. Oasis' purpose is evident; it intends its CD–ROM product to compete directly with West's CD–ROM product and with West's bound volumes.

Just as in *Nation* and *Meredith,* the express purpose of the allegedly infringing product here is to compete with the work from which it was copied. In those cases the new work also had the beneficial, fair use purposes of news and education, respectively. Yet in both cases the work was not found to be a fair use due to their express intended commercial competition with the copied work. Likewise here, Oasis' use does not have merely the incidental effect but the intended purpose of rivaling West products from which the Oasis product would be copied. Thus, notwithstanding its potential educational and research benefits, the clearly articulated directly competitive commercial purpose of Oasis' CD–ROM product strongly argues that it is not a fair use of West's arrangement.

#### 2. Nature of the Work

■ The Court now considers the second factor, the nature of the copyrighted work. In this case the work is a compilation, and specifically at issue is the arrangement in that compilation. Original creative works are entitled to greater copyright protection than compilations. *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, ——, 114 S.Ct. 1164, 1175, 127 L.Ed.2d 500 (1994); *Feist,* 499 U.S. at 348–51, 111 S.Ct. at 1289–91. This does not mean, however, that compilations are fair game for unauthorized copying.

In *West Publishing Co. v. Mead Data Central, Inc.* Judge Rosenbaum found that this factor did not weigh in favor of finding a fair use, notwithstanding that West's copyright interest lay in the arrangement of a compilation. 616 F.Supp. 1571, 1580. Similarly here, while the nature of the work may make it more vulnerable to fair use copying, the facts of this case nevertheless do not support a finding of fair use.

### 3. Amount and Substantiality of the Portion Used

■ The third § 107 factor questions whether the amount and substantiality of the portion used in relation to the work as a whole are reasonable in relation to the purpose of the copying. *Campbell,* 510 U.S. at ——, 114 S.Ct. at 1175. This factor also requires consideration not merely of the quantity of the materials used, but of their quality and importance as well. *Id.; Nation,* 471 U.S. at 564–56, 105 S.Ct. at 2232.

As established while considering the first factor, Oasis recognizes that its product may, for some, serve utterly to replace West's infringed products. This is not a surprising prediction on Oasis' part; once Oasis publishes its CD–ROM product with star pagination, writers using the product who desire to cite to opinions reported in West's reporter could do so without using West's products at all. In *Nation,* the Supreme Court agreed with the district court that the copy "took what was essentially the heart" of the copied work. 471 U.S. at 564–65, 105 S.Ct. at 2232–33. Here, Oasis' product would copy West's entire arrangement of the Florida appellate decisions completely. Oasis points to its "need" for star pagination. However, that Oasis "needs" West's internal pages in order to replace West products on the market is not the proper focus of this factor. To fully trump Time Magazine, certainly The Nation "needed" to reproduce the substantively valuable portions of President Ford's manuscript. Nevertheless, its use was not a fair use. Oasis' particular copying here would serve to supersede West's print and CD–ROM products. As in *Mead,* the proposed star pagination of West's arrangements here constitutes copying that "is both quantitative-

ly and qualitatively substantial." *See Mead,* 616 F.Supp. at 1580–81.

### 4. Effect on Potential Market for Copyrighted Work

■ The final factor concerns the effect of the use on the potential market for or value of the copyrighted work, and "is undoubtedly the single most important element of fair use." *Nation,* 471 U.S. at 566, 105 S.Ct. at 2233. This is because when fair use is properly applied, it "is limited to copying by others which does not materially impair the marketability of the work which is copied." *Id.* (quoting 1 M. Nimmer, Copyright § 1.10[D], p. 1–87). So considered, this factor weighs heavily against a finding of fair use.

■ This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in substantially adverse impact on the potential market' for the original." *Campbell,* 510 U.S. at ——, 114 S.Ct. at 1177 (quoting 1 M. Nimmer, Copyright § 13.05[A][4], p. 13–102.61). As a general rule, where the use is for commercial gain, the likelihood of damaging the prior work's market position is presumed. *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 450–51, 104 S.Ct. 774, 792–93, 78 L.Ed.2d 574 (1984) ("[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright. . . ."). However, the presumption of market harm is not applicable and a further showing may be necessary where the allegedly infringing work is transformative, such as a parody or other critical work. *Campbell,* 510 U.S. at —— – ——, 114 S.Ct. at 1177–78. The question then becomes whether this case is more a direct copying or a transformation of West's product.

■ The Court has no difficulty concluding Oasis' CD–ROM duplication of West's arrangement is a mere copying and not a transformation. The Court recognizes that the legal research capabilities provided by

computer technology exceeds that achieved by thumbing through page after page of hard-bound print. But this fact does not aid Oasis. First, as West points out, West already markets a CD–ROM product containing the decisions and arrangement Oasis' product would contain, and Oasis anticipates its CD–ROM product will be priced lower than West's. *See Nation,* 471 U.S. at 568, 105 S.Ct. at 2234–35 (stating that harm to derivative works, as well as to the original work, must be considered).

Second, even in relation to the printed decisions the Oasis' product is nontransformative. Oasis asserts the following features transform its CD–ROM product:

> Oasis' product can be used by its customers to sort by court, subject matter, judge, attorney, chronological order, and other ways.... [T]he user can "cut and paste," embed editorial notes, and perform other functions.

Oasis Mem.Resp. at 27.

Taken to its logical conclusion, under Oasis' theory, transferring a written textbook into a garden variety computer database program would "transform" the textbook and constitute a fair use. After all, the computer user could search for key words or phrases and skip from point to point in the text; she could sort by an infinite variety of categories, "cut" sections from the text and "paste" them into her own writings, and could research the text using her computer in ways she could not even imagine with a simple printed version of the same text. The new, more convenient medium, however, does not "transform" the original work; it merely provides new ways of practically manipulating and using the text. Essentially, the CD–ROM program is merely a different medium than the printed source, but this is no defense to a claim of infringement. By analogy, a book copied from a television series may constitute infringement, *Twin Peaks Productions, Inc., v. Publications International, Ltd.,* 996 F.2d 1366 (2d Cir.1993), a motion picture copied from a novel, *Twentieth Century–Fox Film Corp. v. MCA, Inc.,* 715 F.2d 1327 (9th Cir. 1983), the implementation of the process in a computer program copied from the words of the program, *Apple Computer, Inc. v. Franklin Computer Corporation,* 714 F.2d 1240 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984), prints on clothing copied from drawings on gift wrapping paper, *Eden Toys, Inc. v. Florelee Undergarment Co.,* 697 F.2d 27 (2d Cir.1982), a motion picture from a play, *Twentieth Century–Fox Film Corp. v. Stonesifer,* 140 F.2d 579 (9th Cir.1944), and "Betty Boop" dolls from a book of cartoons. *Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc.,* 73 F.2d 276 (2d Cir.1934), *cert. denied,* 294 U.S. 717, 55 S.Ct. 516, 79 L.Ed. 1250 (1935). "[T]hat a work in one medium has been copied from a work in another medium does not render it any the less a "copy." 2 M. Nimmer, Copyright § 8.01[B], pp. 8–15, 8–16.

Because Oasis' proposed CD–ROM product is nontransformative, the Court presumes market harm to West. This presumption is hardly necessary here, however, since Oasis' marketing plan expressly contemplates "obvious paper savings ... from purchasing one compact disc *versus* shelves and shelves of hard bound books." And as the Supreme Court has established, "to negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for copyrighted work.'" *Nation,* 471 U.S. at 568, 105 S.Ct. at 2234 (quoting *Sony,* 464 U.S. at 451, 104 S.Ct. at 793) (emphasis added by *Nation* Court). Oasis does not dispute that it intends to undercut West's CD–ROM prices or that its product could replace the need for West's printed product altogether at least for some segment of the market. But "the fair use doctrine has always precluded a use that supersedes the use of the original." *Nation,* 471 U.S. at 550, 105 S.Ct. at 2225 (citation omitted). The final factor cannot support a fair use exception here. Taken together, all factors establish that Oasis' proposed star pagination is not a "fair use" of West's arrangement.

## IV. Effect of "Official" Designation

Oasis contends that West is the official reporter of the Florida appellate court decisions based on Florida Statute Section

25.381,[5] West's publication of the Florida Supreme Court's notice adopting the *Southern Reporter* as its official reporter,[6] and West's acquiescence in Florida's view of West as its official reporter. Thus, argues Oasis, coupled with the fact that the Florida—West contract requires West to publish in the *Florida Cases* the Florida decisions as they appear in the *Southern Reporter*, the *Florida Cases* are in the public domain. West concedes that where it publishes the official reports of a state, publishers are free to star paginate to those reports. However, West denies it publishes the official reports of Florida. Florida is not a party to this action. This Court is reluctant to mark the legal relationship between the State of Florida and West, and the facts of this case do not require it to do so. The Court reiterates that it is not the Florida appellate decisions themselves but the arrangement of the decisions which constitutes the substance of West's copyright interest at issue. Even if West were the official reporter of the State of Florida as argued by Oasis—an issue the Court does not determine today—the copyright interest in the arrangement of the cases published by West, by express consent of the State of Florida, remains with West.

 Oasis does not argue that the digest material written and included in the reports by West are in the public domain. This omission is proper. The publication or other use by the government of a private work does not diminish copyright protection. *See, e.g., Practice Management Information Corp. v. American Medical Association*, 877 F.Supp. 1386 (C.D.Cal.1994) (holding the American Medical Association's copyright interest was not destroyed by the govern-

ment's adoption of the AMA's procedural terminology book though the government required doctors to reference and cite to the book and to use its code-numbering system and service description to collect reimbursements for various services the doctors provided). But, according to Oasis, the *Florida Cases* has fallen from copyright protection into the public domain due to West's relationship with Florida. At the same time Oasis concedes that West has a protected copyright interest in the digest material, despite the alleged adoption of the *Florida Cases* or the *Southern Reporter* as the official reporter of the state. This position implicitly recognizes that the express agreement between West and Florida withholds in West's copyright interest in the digest and other original material.

The insurmountable difficulty with Oasis' argument is that the same agreement also reserves in West the copyright interest in the arrangement of the cases. Oasis provides nothing demonstrating that the State of Florida has ever sought to divest West of any protectable copyright interest West holds in the reports. Indeed, quite the opposite is apparent; since 1957 each relevant contract between West and Florida has acknowledged West's copyright interest in "The Synopsis, Syllabi, and Key Number Digest classifications, Index Digest, Table of Statutes Construed ... in the volumes of *Florida Cases*," notwithstanding Florida Supreme Court's pronouncement that it was adopting the *Southern Reporter* as the official publication of its decisions. And in all contracts for the publication of the *Florida Cases* after the Eighth Circuit's decision in *Mead*, West and Florida have expressly included the "ar-

---

**5.** In relevant part, that statute states:

The reports of the opinions of the Supreme Court and the district courts of appeal shall be known as Florida Cases. In July, 1963, and every second year thereafter until otherwise provided by law, the Supreme Court and the Attorney General shall jointly enter into a contract with West Publishing Corporation, St. Paul, Minnesota, providing for the publication ... and distribution of such copies of Florida Cases as necessary to furnish copies thereof to the officers and institutions as required or authorized by law. The copies of such reports purchased by the state under such contract

shall be paid for from moneys appropriated for this purpose. Fla.Stat.Ann. § 25.381.

**6.** That notice, signed by the Chief Justice of the Supreme Court of Florida, states:

The SOUTHERN REPORTER, beginning with 1948 Florida Supreme Court cases reported in 37 So.2d 692 *et. seq.*, is adopted by the Supreme Court of Florida, and by the Board of Commissioners of State Institutions of Florida as the official publication of the opinions and decisions of the Supreme Court of Florida. This book connects with Volume 160 Florida Reports, without omission or duplication.

rangement of cases" under the cover of West's copyright umbrella. Oasis does not dispute that this language was added specifically in contemplation of *Mead* and that Florida freely acquiesced to the added language. Given the timing and context of this particular caveat, that it regarded the internal pagination of decisions in the *Florida Cases* is self evident. Furthermore, Oasis does not argue that the addition represents a break with any prior understanding or that it was anything more than a reaffirmation that West is not divested of any protectable interest otherwise provided it under the Copyright Act.

In sum, neither Florida nor West have evidenced in their contracts an agreement to divest West of its copyright interest in the arrangement of cases. In fact, the undisputed evidence establishes that the parties agreed that West would retain its interest in the arrangement. On this basis, even assuming, *arguendo,* that by state adoption and contract West is the "official" reporter of Florida as argued by Oasis, such that its publications of Florida decisions are in the public domain, West retains its rights in the arrangement of the decisions.

## V. Florida Public Records Law

■ Finally, Oasis argues that both the text and pagination of the reports of decisions contained in the *Florida Cases* are freely copyable because the *Florida Cases* is a public record of Florida pursuant to the state's Public Records Act.[7] West argues that Florida's Public Records Act is inapplicable to the judiciary and its records, *Times Publishing Co. v. Ake,* 660 So.2d 255 (Fla. 1995), that allowing the Florida Public Records Act to invalidate West's copyright interest in the arrangement would violate the Supremacy Clause of the United States Constitution, and that the contractual reservation of West's original material to West in any event excepts the pagination of the reports from Florida's Public Records Act. West's final argument makes unnecessary an interpretation of the Florida Public Records Act or application of the Supremacy Clause.

Oasis acknowledges that though West's digest material is published in the *Florida Cases,* the Public Records Act does not bring this material into the public domain. As with the "official" status of West's publications, the very agreement that excepts the digest material from the Public Records Act also excepts the arrangement of the cases. Assuming, again without deciding, that the Florida Public Records Act includes the judicial decisions as reported by West, the State of Florida has by contract exempted the arrangement of cases from the scope of the Public Records Act by reserving in West its copyright interest in the arrangement of cases.

## CONCLUSION

West has a protectable copyright interest in the arrangement of the decisions in the *Florida Cases.* Oasis' proposed star pagination would infringe copyrightable elements of West's arrangement. Oasis' proposed star pagination is not a "fair use" of West's arrangement. Neither the "official" designation of the *Florida Cases* or *Southern Reporter,* nor the Florida Public Records Act renders West's copyright interest unenforceable.

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. West Publishing Company's Motion for Partial Summary Judgment (Clerk Doc. No. 57) is GRANTED;

2. Counts V and VI are DISMISSED WITH PREJUDICE; and

3. Oasis Publishing Company, Inc.'s Cross–Motion for Partial Summary Judgment (Clerk Doc. No. 66) is DENIED.

---

**7.** The state's Public Records Act establishes a policy "that all state, county, and municipal records shall be open for personal inspection by any person." Fla.Stat. ch. 119.01.